**AMERICAN AND FOREIGN INSURANCE COMPANY, Royal Insurance Co. of America, Safeguard Insurance Company and Royal Indemnity Company**

v.

**JERRY'S SPORT CENTER, INC., Jerry's Sport Center Northeast, Inc., Bonitz Brothers, Inc. Outdoor Sports Headquarters, Inc., Simmons Gun Specialties, Inc., National Assoc. for the Advancement of Colored People, National Spinal Cord Injury Assoc., American International Insurance Company, Doe Corporations 1–15**

**Appeal of Jerry's Sport Center, Inc., Jerry's Sport Center Northeast, Inc., Bonitz Brothers, Inc., Outdoor Sports Headquarters, Inc. and Simmons Gun Specialties, Inc., Appellants.**

Superior Court of Pennsylvania.

Argued Jan. 9, 2008.

Filed May 5, 2008.

Sal Cognetti, Jr., Scranton, for appellant.

Celeste M. Butera, Uniondale, NY, for appellees.

Before STEVENS, ORIE MELVIN and BENDER, JJ.

OPINION BY BENDER, J.:

¶ 1 Jerry's Sport Center, Inc., and its subsidiaries, Jerry's Sport Center Northeast, Inc., Bonitz Brothers, Inc., Outdoor Sports Headquarters, Inc., and Simmons Gun Specialties, Inc. (collectively, "Jerry's Sport"), appeal from the July 7,

2006 judgment entered in favor of its commercial liability insurer, American and Foreign Insurance Company, Royal Insurance Company of America, Safeguard Insurance Company, and Royal Indemnity Company (collectively, "Royal"). For the reasons that follow, we conclude the trial court erred by granting Royal's request for reimbursement of attorney fees that Royal had paid on behalf of Jerry's Sport while Royal undertook a defense for Jerry's Sport in an underlying suit pursuant to Royal's putative reservation of rights for reimbursement of the attorneys fees from Jerry's Sport should the court later (as it did) declare there was no coverage under the policy. Accordingly, we reverse the July 7, 2006 judgment entered in Royal's favor.

¶ 2 The trial court set forth the following recitation of the facts in this case:

Plaintiff [Royal] and Defendant firearm wholesaler-distributors ... "Jerry's Sports" ... entered a commercial liability primary and umbrella insurance contract on or about October 18, 2000. Jerry's also insured with American International South Insurance Company ("AIG") during this period.

In June 2000, the National Association for the Advancement of Colored People ("NAACP") and the National Spinal Cord Injury Association ("NSCIA") filed a civil action against several firearms wholesaler-distributors in the United States District Court for the Eastern District of New York in the action entitled National Association for the Advancement of Colored People, et al. vs. Acusport Corporation, et al., Case No. 99 CV 8037(JBW). Jerry's Sports was named as a defendant in this action in May of 2001. The action alleged injunctive and monetary damages against Jerry's Sports for negligence in the marketing and distribution of handguns,

thereby causing injury, death, and other damages to NAACP/NSCIA members. Jerry's Sports provided notice of the suit to Royal and tendered the claim for defense and indemnification.

Upon receipt of the suit papers, Royal retained the New York City law firm of Leahey & Johnson to represent Jerry's Sports in the matter. In June 2001, Royal informed Mr. Andrew Kupchik, President of Jerry's Sports, that it had retained Leahey & Johnson in the belief that it was more appropriate to have independent counsel defend Jerry's Sports in the NAACP/NSCIA action rather than have Jerry's Sports participate in a group or joint defense with the other gun distributors named as defendants. Royal also informed Mr. Kupchik that Royal had selected Leahey & Johnson as counsel since the firm had prior gun litigation experience against Ms. Eliza Barnes, plaintiff's counsel in the NAACP/NSCIA suit. Royal also informed Mr. Kupchik that Leahey & Johnson would be devoted solely to the interests of Jerry's Sports, regardless of the additional distributor defendants.

By letter dated June 15, 2001, Royal confirmed its conversations with Jerry's Sports that Royal had retained counsel to defend Jerry's Sports and that Royal was examining coverage issues related to the insurance policy held by Jerry's Sports with Royal. In that letter, Royal advised Jerry's Sports that it was providing Jerry's Sports with a defense under a full reservation of rights, including the right to seek reimbursement of all defense fees advanced in the event it was determined that Royal had no duty to defend Jerry's Sports in the NAACP/NSCIA action. Royal also advised Jerry's Sports that it had the right to retain its own counsel to consult with Leahey & Johnson on the case.

On June 25, 2001, Mr. Kupchik called Royal to express a concern that in the event there was no coverage for the claim and Jerry's Sports had to assume the costs of defense, it might be less costly for Jerry's Sports to join a defense group rather than proceed with Leahey & Johnson. Royal informed Mr. Kupchik that if Jerry's Sports decided to use a firm other than Leahey & Johnson, Royal would afford Jerry's Sports ample opportunity to arrange for the change in counsel. However, Royal never received any information from Jerry's Sports regarding any other defense lawyer it wished to retain.

Royal further informed Mr. Kupchik that from the time [Jerry's Sports] tendered the claim to Royal until the date Royal made its final coverage determination, it would continue to advance the costs of the defense of Jerry's Sports in the NAACP/NSCIA action. However, if Royal determined that Jerry's Sports was not entitled to coverage under the Royal insurance contracts, and Royal continued to advance the costs to defend the action, Royal would seek reimbursement of any defense costs advanced on behalf of Jerry's Sports after the date Royal made its final determination of coverage. Royal confirmed its conversation with Mr. Kupchik by letters dated July 12, 2001; July 18, 2001; and August 2, 2001.

On September 7, 2001, Royal informed Jerry's Sports in writing of its final coverage determination that Royal had no duty to defend or indemnify Jerry's Sports in the NAACP/NSCIA action. Royal also advised Jerry's Sports that Royal was going to commence a declaratory relief action seeking a judgment that Royal had no duty to defend or indemnify Jerry's Sports. In the interim, Royal stated that it would continue to advance the costs of defense in the NAACP/NSCIA action and informed Jerry's that, in the event it was successful in its declaratory relief action, it might also seek reimbursement from Jerry's Sports of any defense costs Royal advanced for the defense of Jerry's Sports from September 7, 2001, the date of its final coverage determination letter. Royal never received any request from Jerry's Sports after the September 7, 2001 correspondence that it wanted to change counsel or that it wanted any law firm other than Leahey & Johnson in the NAACP/NSCIA action.

On or about August 2, 2001, Royal entered into an agreement with AIG, whereby AIG agreed to pay for half of the defense costs of Jerry's Sports in the NAACP/NSCIA action. AIG never requested that Royal consider having the defense of Jerry's Sports joined with the other eighteen distributor defendants in the case. Royal never received any objections from AIG regarding the costs of the defense of Jerry's Sports in the matter, and AIG paid fifty percent of every bill incurred for that defense.

The president of Jerry's Sports, Mr. Kupchik, participated with Leahey & Johnson in the defense of Jerry's Sports in the NAACP/NSCIA action. He reviewed interrogatories and documents requests, assisted in the preparation of responses to discovery requests, and had meetings with Mr. Johnson and other lawyers from Leahey & Johnson regarding the defense of Jerry's Sports. Jerry's Sports understood that the experts retained on its behalf would be expensive, and that they would work exclusively on the behalf of Jerry's Sports. Representatives of Jerry's Sports were heavily involved in discussing litigation strategy with Leahey & Johnson and kept familiar with the progress of the case at all times. At no point in time

did Jerry's Sports ever request that Leahey & Johnson join the defense efforts of the firm representing the other distributor defendants in the NAACP/NSCIA action, nor did Jerry's Sports ever request that Leahey & Johnson share in the experts retained by the other defendants in the case. Jerry's Sports never objected to the work being done by Leahey & Johnson on its behalf, nor did it request that Royal send it a copy of any of the legal bills relating to the defense. At no time, from June 2001 to March 2003, did any representative of Jerry's Sports ever make any inquiry to Royal about the defense costs that were being incurred on its behalf. Jerry's Sports advised the adjuster from AIG that it was satisfied with the legal services provided by Leahey & Johnson and at no time requested a change in counsel from AIG.

The NAACP/NSCIA action sought to hold the firearms industry liable for harm allegedly suffered by association members through the negligent creation of a public nuisance by gun distributors and manufacturers by virtue of their failure to distribute firearms in a reasonable and safe way. It sought remediation and future oversight of the firearms industry. Prior to its retention on behalf of Jerry's Sports, Leahey & Johnson had represented several gun industry defendants in an earlier, similar action titled *Hamilton v. Accu–Teck*, which had proceeded before Federal District Judge Jack Weinstein of the Eastern District of New York, the same judge to whom the NAACP/NSCIA action had been assigned. Attorney Peter James Johnson, Jr. ("Attorney Johnson") of Leahey & Johnson had represented the defendants in the *Hamilton* case, and also took on Jerry's Sports as a client in the NAACP/NSCIA action.

Jerry's Sports was one of the larger distributors named in the suit. At a meeting in May of 2002, Plaintiff's attorney informed Leahey & Johnson that Jerry's Sports, because of its position as one of the largest handgun distributors in the United States, and because Jerry's Sports was failing to evaluate or monitor its downstream distribution of firearms, was going to be a "primary target" in the NAACP/NSCIA action.

Leahey & Johnson determined that, should the NAACP/NSCIA action succeed, Jerry's Sports would have to dramatically change the way it did business, and might not even survive into the future. Leahey & Johnson determined that in order to protect Jerry's Sports, individual representation should be provided, separate from the other defendants, as conflicts of interest among the defendants might disadvantage Jerry's Sports as the case proceeded. Leahey & Johnson additionally determined that experts should be consulted separately from the other defendants, to insure that the interests of other defendants did not interfere with those of Jerry's Sports.

Jerry's Sports designated five experts in this case. Two experts were retained as general experts on the firearms industry. William Vizzard, DPA, was needed to give an opinion that Jerry's Sports was acting as a reasonable firearms distributor and to opine on the viability of the methods for relief contained in plaintiff's complaint. Gary Kleck, Ph.D., was hired as an expert on gun control strategies in the United States.

Three additional experts were retained to analyze Bureau of Alcohol, Tobacco, and Firearms ("BATF") and other data relied upon by the NAACP and NSCIA in their suit to show that the defendants' negligent practices had re-

sulted in injury to association members. Mark Gertz, Ph.D., was hired to examine these data in order to render an opinion on the reasonableness of Jerry's Sports['s] distribution practices. Two further experts, hired through the firms of Wieser Consultants and Auditwatch, were not used as expert witnesses but to check the analytical methodology of the plaintiffs in relation to these data. Analysis of BATF data was pivotal to the case, as this data was being used by the plaintiffs to indicate the various distributors' proportionate liability for the alleged faulty marketing practices. It was determined that an analysis made separately from that of the co-defendants in the case was necessary, as different interpretations of the data could conceivably work to the advantage of one defendant while working to the disadvantage of another. Other defendants named in the suit conducted their businesses differently than Jerry's Sports, and might have conceivably engaged in the unreasonable practices alleged by the NAACP and NSCIA. As such, their interests in the interpretation of the data might be at odds with Jerry's Sports.

In the course of the NAACP/NSCIA case, over fifty depositions were taken and tens of thousands of documents turned over in discovery. There was a tremendous amount of computer discovery, and hundreds of thousands, if not millions, of trace data requests from the BATF to be reviewed. In preparing for trial, Leahey & Johnson reviewed numerous books and articles on the firearms industry, gun litigation documents from around the country, and issues related to the BATF.

Finally, Leahey & Johnson researched and prepared affidavits and extensive briefs in support of an exhaustive summary judgment motion which resulted in the dismissal of Jerry's Sports from the litigation before the case went to trial. Leahey & Johnson secured a stipulation of dismissal with prejudice with no conditions imposed upon Jerry's Sports. The stipulation dismissed all claims, including potential claims and all remedies, against Jerry's Sports with prejudice.

Thereafter, a six-week trial commenced in the action. As a result of the stipulation of dismissal entered in its favor, Jerry's Sports was the only defendant who did not have to participate in the trial. At the conclusion of the trial, Judge Weinstein found that there was in fact a public nuisance caused by the defendants' conduct in the manufacturer and distribution of handguns. However, the court ruled against the plaintiffs after finding that the plaintiffs lacked standing to pursue their claims.

For their work on the NAACP/NSCIA case, Leahey & Johnson charged $160.00 an hour for a partner's time, $130.00 to $145.00 an hour for an associate's time, and $70.00 an hour for a paralegal's time. These fees were on the low end of rates being charged at the time by firms representing clients in complex litigation in the New York City area during the 2001–2003 time frame. New York City firms at the time generally charged from $200.00 to $250.00 an hour for a partner's time, $165.00 to $200.00 an hour for an associate's time, and $70.00 an hour for a paralegal's time.

Throughout the entire course of the NAACP/NSCIA litigation, Royal and AIG paid for the defense costs of Jerry's Sports. Each bill received by Royal in connection with this case was reviewed by Royal's adjuster to determine if it reflected the strategy discussed with counsel, if the hourly charges were rea-

sonable for the work performed, and whether the bills were fair and reasonable. In 2002, Royal employed the services of a third party entity known as Concero to automatically review the bills for legal services rendered by defense counsel to determine if the charges and services were fair and reasonable for the particular matter. This included a review for duplicate time charges, excessive time charges, attorneys performing paralegal functions, and expenses review. From 2002 until the termination of the NAACP/NSCIA action, all bills for legal services incurred in the defense of Jerry's Sport[s] went through this independent review to determine if the bills were fair and reasonable. At the time these bills were processed, Royal had billing guidelines in place for law firms representing Royal insureds. However, in complex litigation, such as the NAACP/NSCIA case, these guidelines were applied differently than in simple negligence cases, and more advanced and experienced adjusters given more discretion to deviate from these guidelines. Royal adjusters authorized numerous deviations because of the difficulty of the NAACP/NSCIA case after adjudging that such deviations were reasonable under the circumstances, and Concero agreed that these charges were reasonable. After the bills were received from Leahey & Johnson, reviewed by both the adjuster and, after 2002, Concero, Royal deducted one half of that balance to reflect AIG's contribution, deducted any further discounts agreed to with Leahey & Johnson, and issued payment to Leahey & Johnson.

Trial Court Opinion (T.C.O.), 6/13/06, at 1–9.

¶ 3 As noted above, on September 12, 2001, Royal commenced a declaratory judgment action in the Civil Division of the Court of Common Pleas of Susquehanna County. In the declaratory judgment action, Royal averred, *inter alia*, that the terms of its policy entailed no duty to defend or indemnify Jerry's Sport in the NAACP case because the NAACP case did not allege or involve "bodily injury" as defined in the policy. *See* Plaintiffs' Complaint for Declaratory Relief, 9/12/01, at ¶ 41.

¶ 4 On July 16, 2002, Royal filed a motion for summary judgment in which it requested that the court, *inter alia*, declare that Royal was under no duty to defend or indemnify Jerry's Sport in the NAACP action and declare that Royal is entitled to reimbursement for attorneys fees and costs paid on behalf of Jerry's Sport in connection with the defense of the NAACP action. On February 25, 2003, the trial court granted Royal's motion for summary judgment in the declaratory judgment action, finding that Royal had no duty to defend or indemnify Jerry's Sport because the policy covered damages resulting from bodily injury, and the NAACP's suit did not seek compensation for bodily injury but, rather, sought injunctive relief and the creation of a monetary fund to educate, supervise, and regulate gun dealers. Opinion, 2/25/03, at 1, 5. However, the order did not indicate that the court was granting Royal reimbursement of attorneys fees advanced to Jerry's Sport in defense of the NAACP action.

¶ 5 Jerry's Sport filed a notice of appeal to our Court on March 24, 2003. Royal filed a motion to quash the appeal, contending that the order granting summary judgment was interlocutory because Royal's claim for reimbursement for attorneys fees and costs (incurred in the defense of the NAACP case from the date Royal filed its declaratory judgment action) remained outstanding. Our Court denied Royal's motion to quash and, on April 23, 2004, we

issued a memorandum opinion affirming the grant of summary judgment in Royal's favor. We concluded, like the trial court, that the allegations in the NAACP's complaint did not trigger coverage because the policy covered damages for bodily injury and the NAACP complaint did not seek compensation for bodily injury. *American and Foreign Ins., et al. v. Jerry's Sport Center, Inc., et al.,* No. 463 MDA 2003, unpublished memorandum at 8, 852 A.2d 1241 (Pa.Super. filed April 23, 2004). We did not expressly indicate in the memorandum opinion that we were remanding to the trial court or relinquishing jurisdiction.

¶ 6 On May 11, 2004, Royal filed a motion in the trial court entitled, "Plaintiffs' Motion for Reimbursement of Defense Fees." In the motion, Royal sought reimbursement of defense costs, in the amount of $317,540.29, which had been expended in the NAACP case on behalf of Jerry's Sport from the date of the filing of Royal's declaratory judgment action on September 12, 2001. Plaintiffs' Motion for Reimbursement of Defense Fees, 5/11/04, at ¶ 7.

¶ 7 On August 2, 2004, the trial court entered an order specifically finding that an implied contract existed between the parties, as further explained below. Order, 8/2/04. Accordingly, the trial court scheduled a hearing "for the court to take evidence of the parties on the issue of quantum meruit as to the defense costs related to the defense of the NAACP action." *Id.*

¶ 8 On September 20, 2005, Jerry's Sport sought dismissal of Royal's request for reimbursement or, in the alternative, certification pursuant to 42 Pa.C.S.A. § 702(b) (governing interlocutory appeals by permission). In their motion to dismiss, Jerry's Sport argued that: (1) following our Court's affirmance of the grant of

declaratory relief in Royal's favor, our Court did not remand this matter to the trial court or relinquish jurisdiction, so the trial court did not have jurisdiction to grant reimbursement; (2) Royal never pled a cause of action for quantum meruit, unjust enrichment, or implied contract, and did not request such relief in their pleadings for declaratory judgment, thereby waiving their claim for reimbursement; and (3) the relief requested in Royal's motion for reimbursement was not available under the Declaratory Judgments Act, 42 Pa.C.S. §§ 7531–7541. *See* Motion to Dismiss, 9/20/05, at ¶¶ 4, 6, 8, 11, 16.

¶ 9 On September 23, 2005, the trial court entered an order denying Jerry's Sport's motion to dismiss or certify the case for an interlocutory appeal. Jerry's Sport filed a motion for reconsideration; however, on October 7, 2005, the trial court entered an order and opinion denying the motion for reconsideration. In that opinion, the trial court specifically found that "the supplemental relief in the form of reimbursement of attorney's fees is necessary and proper to effectuate justice in this matter." Opinion, 10/7/05, at 2.

■■■ ¶ 10 The trial court then conducted hearings on October 17, 2005, and January 27, 2006, in order to determine the proper amount to be reimbursed to Royal under a quantum meruit theory. On June 13, 2006, the trial court entered a verdict in favor of Royal "in the sum of $309,215.86, plus six percent per annum in prejudgment interest from August 2, 2004." Verdict, 6/13/06. On June 27, 2006, Jerry's Sport filed a notice of appeal to our Court from the June 13, 2006 verdict. Pursuant to Royal's praecipe, the prothonotary of Susquehanna County entered judgment on the verdict in the amount of $345,819.14 on July 7, 2006.[1]

---

1. Even though Jerry's Sport filed its notice of     appeal from the verdict that was entered, and

¶ 11 In its brief to this Court, Jerry's Sport sets forth the following "Statement of the Questions Involved" pursuant to Pa.R.A.P. 2116(a):

1. WHETHER THE LOWER COURT COMMITTED AN ERROR OF LAW IN FINDING AN IMPLIED CONTRACT BETWEEN THE PARTIES ENTITLING THE INSURER TO RECOUP THE COSTS EXPENDED IN DEFENDING A DISPUTED CLAIM PRIOR TO A FINAL JUDGMENT ON THE COVERAGE ISSUE WHERE THE RELATIONSHIP BETWEEN THE PARTIES WAS GOVERNED BY A WRITTEN INSURANCE POLICY WHICH DID NOT GRANT THE INSURER THE RIGHT TO RECOVER DEFENSE COSTS.

2. WHETHER THE LOWER COURT LACKED SUBJECT MATTER JURISDICTION WHERE RELIEF REQUESTED BY THE PLAINTIFF WAS NOT PROPERLY BEFORE THE COURT BECAUSE JUDGMENT IN THE MATTER WAS FINAL, THE RELIEF REQUESTED WAS NOT AVAILABLE UNDER THE DECLARATORY JUDGMENTS ACT AND THE PLAINTIFFS HAD NOT PLED A QUASI–CONTRACTUAL CAUSE OF ACTION NOR SOUGHT SUCH RELIEF IN THEIR COMPLAINT.

3. WHETHER THE LOWER COURT ABUSED ITS DISCRETION WHEN IT AWARDED AN UNREASONABLE AMOUNT OF REIMBURSEMENT TO ROYAL UNDER A QUANTUM MERUIT THEORY.

Jerry's Sport's brief at 3 ("suggested answers" omitted).

¶ 12 We will now examine the first issue and argument presented by Jerry's Sport. As the trial court noted, based on its reservation of rights letters, Royal sought reimbursement of attorney fees and costs expended on behalf of Jerry's Sport in the defense of the NAACP action "from September 7, 2001 [*i.e.*, the date of Royal's final coverage determination letter to Jerry's Sport wherein Royal concluded that there was no coverage] until the date of [the trial] court's ruling ... declaring that Royal had no duty to defend or indemnify Jerry's Sport in the NAACP ... action [*i.e.*, the February 25, 2003 order granting summary judgment in Royal's favor in the declaratory judgment action]." T.C.O. at 11.[2] The propriety of the court's

final judgment was entered after the filing of Jerry's Sport's notice of appeal, we conclude that this defect will not effect the validity of the appeal and we will treat the appeal as having been taken from the final judgment in this case. *See* Pa.R.A.P. 905(a) ("A notice of appeal filed after the announcement of a determination but before the entry of an appealable order shall be treated as filed after such entry and on the day thereof."); *Ferris v. Harkins*, 940 A.2d 388, 394 (Pa.Super.2007) (perfecting appeal even though notice of appeal improperly taken from order granting JNOV and entering damages in favor of opposing party rather than from final judgment); *Johnston the Florist, Inc. v. TEDCO Constr. Corp.*, 441 Pa.Super. 281, 657 A.2d

511, 513 (1995) ("[I]t is clear that jurisdiction in appellate courts may be perfected after an appeal notice has been filed upon the docketing of a final judgment."). We have corrected the caption to indicate that the appeal is from the judgment entered in this case on July 7, 2006, rather than the order announcing the verdict on June 13, 2006.

2. Actually, in their motion for reimbursement, Royal requested reimbursement of defense costs expended in the underlying action from the date it filed its declaratory judgment action on September 12, 2001, which was five days after the date of its final coverage determination letter. This discrepancy exists throughout the record, but it is inconsequen-

order that reimbursed Royal for defense fees and costs expended during that period of time under Royal's putative reservation of rights is at the heart of this appeal. As this presents "a question of law, our scope of review is plenary, and our standard of review is *de novo.*" *Gillette v. Wurst,* 594 Pa. 544, 937 A.2d 430, 435 (2007).

¶ 13 Jerry's Sport contends that "[t]he right of an insurer to recoup costs expended when defending under a reservation of rights has not been directly addressed by a Pennsylvania appellate court." Jerry's Sport's brief at 11. Royal agrees that the issue is one of first impression in our state. Royal's brief at 25. Jerry's Sport explains that, among the other jurisdictions that have considered the issue, there is a split in the case law.

¶ 14 Royal contends that we should follow the decisions of the majority of jurisdictions, such as California in the seminal case of *Buss v. Superior Court,* 16 Cal.4th 35, 65 Cal.Rptr.2d 366, 939 P.2d 766 (1997),[3] which have found a right of reimbursement based on the existence of an implied contract between the insurer and its insured created through a reservation of rights letter, in addition to unjust enrichment of the insured from the insurer's coverage of defense costs for claims that were determined to not be within the coverage provided by the policy. This is essentially the reasoning that was employed by the trial court in the instant case when it granted reimbursement to Royal. Although the trial court cited no legal authority in its order and opinion of August 4, 2004, it specifically found that, first, "an implied contract exist[ed] between the parties from September 12, 2001, while [Roy-

al] undertook defense of the NAACP action until the present [i.e., August 2, 2004] inasmuch as Royal is still awaiting payment of its defense costs[,]" and, second:

> [i]t is apparent that Royal conferred the benefits of a legal defense upon Jerry's Sports in connection with its defense of the NAACP action, that Jerry's Sports retained those benefits and, lastly, to allow Jerry's Sports to accept and retain those benefits would be inequitable without payment of fair value for the same. To that end, we are of the opinion that the remedy of quantum meruit should be applied by the court to resolve this matter.

Opinion, 8/2/04, at 2. It was following this order and opinion that the court scheduled hearings on the issue of quantum merit to determine the reasonable costs of the defense to be reimbursed to Royal.

¶ 15 Jerry's Sport contends, on the other hand, that the court erred by concluding that an enforceable implied contract was created by the reservation of rights letters, that Jerry's Sport was not unjustly enriched when Royal undertook defense of the action on its behalf, and that Royal should not get reimbursement because there was no provision for reimbursement while defending under a reservation of rights in the written insurance contract between the parties. We agree with Jerry's Sport that a number of other persuasive cases, including *Terra Nova Ins. Co. Ltd. v. 900 Bar, Inc.,* 887 F.2d 1213 (3d Cir.1989), wherein the Third Circuit predicted how Pennsylvania appellate courts would rule on the issue, and the key Illinois case of *General Agents Ins. Co. of*

tial to our analysis in this appeal. Nevertheless, as the trial court relied on the September 7th date, so shall we in conducting our analysis.

3. Royal notes that a number of other jurisdictions have followed *Buss,* and that *Buss* was cited with approval in *dicta* in a Pennsylvania Court of Common Pleas case, *Rohm & Hass Co. v. Continental Cas. Co.,* 35 Phila. 193 (1997).

*Am., Inc. v. Midwest Sporting Goods Co.,* 215 Ill.2d 146, 293 Ill.Dec. 594, 828 N.E.2d 1092 (2005), discussed in detail *infra,* have determined that insurers cannot receive reimbursement under such circumstances absent an express provision allowing so in the written insurance contract. Jerry's Sport's brief at 11.[4] Given the silence of the insurance contract on the matter of reimbursement, Jerry's Sport argues that allowing reimbursement pursuant to Royal's reservation of rights letters amounts to an impermissible, unilateral modification of the written insurance contract. Jerry's Sport asks us to adopt the policy language based approach of cases such as *Midwest Sporting Goods* and *Terra Nova* and argues that the trial court erred by granting Royal reimbursement because the written policy governing the parties' relationship "did not contain a provision providing for reimbursement of defense costs expended on disputed claims." *Id.* at 10.

¶ 16 For the following reasons, we adopt the position advocated by Jerry's Sport. We begin our analysis with certain principles of Pennsylvania law concerning an insurer's duty to defend its insured, with an emphasis on when the duty arises:

> "An insurer's duty to defend and indemnify the insured may be resolved via declaratory judgment actions." *Erie Insurance Exchange v. Claypoole,* 449 Pa.Super. 142, 673 A.2d 348, 355 (1996) (*en banc*). "In such actions, the allegations raised in the underlying complaint alone fix the insurer's duty to defend." *Id.* As this Court has summarized:

> > The duty to defend is a distinct obligation, separate and apart from the insurer's duty to provide coverage. Moreover, the insurer agrees to de-

fend the insured against any suit arising under the policy even if such suit is groundless, false, or fraudulent. Since the insurer agrees to relieve the insured of the burden of defending even those suits which have no basis in fact, *the obligation to defend arises whenever the complaint filed by the injured party may potentially come within the coverage of the policy.* In order to determine whether a claim may potentially come within the coverage of the policy, we must first ascertain the scope of the insurance coverage and then analyze the allegations in the complaint.

*Britamco Underwriters, Inc. v. Grzeskiewicz,* 433 Pa.Super. 55, 639 A.2d 1208, 1210 (1994) (citations and quotation marks omitted). "This duty to defend, however, is not activated by every allegation raised against the insured." *Claypoole,* 673 A.2d at 355. "Only allegations contained within the underlying complaint pertaining to injuries which are either actually or potentially within the scope of the insurance policy obligate the insurer to defend the insured." *Id.*

*Wilcha v. Nationwide Mut. Fire Ins. Co.,* 887 A.2d 1254, 1258 (Pa.Super.2005) (emphasis added). *See also General Acc. Ins. Co. of America v. Allen,* 547 Pa. 693, 692 A.2d 1089, 1095 (1997) (citations omitted) ("If the complaint against the insured avers facts that would support a recovery covered by the policy, then coverage is triggered and the insurer has a duty to defend until such time that the claim is confined to a recovery that the policy does not cover.").

4. Specifically, for example, the Third Circuit predicted that "the Pennsylvania Supreme Court would preclude an insurer who provides a defense under a reservation of rights from recovering the cost of that defense from its insured if it is later determined that there is no coverage." *Terra Nova,* 887 F.2d at 1219.

¶ 17 Additionally, it is well-established that "a duty to defend is broader than the duty to indemnify." *Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co.*, 589 Pa. 317, 908 A.2d 888, 896 n. 7 (2006) (citation omitted). Accordingly, even "if there are multiple causes of action and one would potentially constitute a claim within the scope of the policy's coverage, the insurer would have a duty to defend until it could confine the claim to a recovery excluded from the policy." *Sclabassi v. Nationwide Mut. Fire Ins. Co.*, 789 A.2d 699, 703 n. 2 (Pa.Super.2001) (finding no duty to defend where underlying complaint asserted intentional tortious acts that were not within scope of insurance coverage).

¶ 18 Our Court examined when the duty to defend was triggered in *Heffernan & Co. v. Hartford Ins. Co.*, 418 Pa.Super. 326, 614 A.2d 295 (1992). There, the insurer refused to defend its insured builder against a third-party's claim for damages incurred when a gymnasium roof constructed by the builder collapsed. The third-party's initial complaint alleged that the collapse was caused by the builder's negligent construction of the building. *Id.* at 296. The insurer refused to defend on the basis that the policy excluded "property damage to work performed by or on behalf of the named insured...." *Id.* However, as litigation progressed through pre-trial discovery, it became clear that the third-party would seek compensation for damages to the contents of the gymnasium, which was potentially covered by the policy. *Id.*

¶ 19 Our Court agreed with the insurer's contention that the averments of the third-party's complaint sought to recover only the cost of repairing the gymnasium, which claim did not fall within the ambit of coverage; however, "[w]hen answers to interrogatories were filed, ... the potential for additional loss [*i.e.*, damage to the contents of the gymnasium] became apparent." *Id.* at 298. It was at that point, when a claim that was potentially covered became apparent, that the insurer's duty to defend was triggered, even though the third-party had not yet amended its complaint. *Id.* Acknowledging the breadth of the duty to defend, we stated:

> Both [the insured] and [the insurer] are now on notice that a claim for damage to the contents of the building will probably be made in the underlying action. If that occurs, coverage will become clear. In the meantime, we conclude, the insurer has an obligation to enter an appearance on behalf of its insured in the underlying action and defend the action. This duty will continue unless and until the claim asserted against the insured can be confined to a recovery which the policy does not cover.

*Id.* See also *Belser v. Rockwood Cas. Ins. Co.*, 791 A.2d 1216, 1219–20 (Pa.Super.2002) (quoting *Board of Pub. Educ. of the Sch. Dist. v. National Union Fire Ins. Co.*, 709 A.2d 910, 913 (Pa.Super.1998) (en banc)) ("An insurer who refuses to defend its insured from the outset does so at its peril, ... because the duty to defend remains with the insurer until it is clear the claim has been narrowed to one beyond the terms of the policy."); *Stevens Painton Corp. v. First State Ins. Co.*, 746 A.2d 649, 655 (Pa.Super.2000) ("[I]t is the duty of the insurer to defend a claim that would support recovery until such time as it is determined that the claim is not covered under the policy.").

¶ 20 The implication derived from *Heffernan*, though not expressly stated therein, is that the duty to defend was triggered when a potentially covered claim became apparent to the insurer, as opposed to being triggered later, as when a court determined actual coverage in a sub-

sequent declaratory judgment action. *See also Claypoole*, 673 A.2d at 355 (1996) (indicating that insurer's duty to defend and indemnify "may be *resolved* via declaratory judgment actions" (emphasis added)). Indeed, we can think of no instance where a trial court in a declaratory judgment action would make a final ruling that a claim was "potentially" covered. Accordingly, it must be the insurer, in the first instance, who would make a determination that a claim is potentially covered such that a legal duty to defend would be triggered. Concluding any differently would eviscerate the longstanding common law rule that the duty to defend is triggered whenever a claim is not just actually covered, but also potentially covered.[5]

¶ 21 Next, we find that the express policy language in the instant case provides that Royal had not just a duty to defend, but also "the *right* . . . to defend the insured against any 'suit' seeking" damages for bodily injury. *See* Commercial General Liability Coverage Form, Section I, Coverage A., ¶ 1 (indicating that Royal has "the right and duty to defend the insured"); *see also id.* at Section IV, ¶ 2.a. (requiring insured to notify Royal "as soon as practicable of an 'occurrence' or an offense *which may result* in a claim" (emphasis added)).

¶ 22 It appears that Royal exercised this right to defend, as expressly provided in the policy, immediately upon tender of the NAACP claim by Jerry's Sport. For example, Royal admits and the record supports the fact that, upon tender of the claim, Royal informed Jerry's Sport that "it was retaining counsel to defend Jerry's Sport in the NAACP action." Royal's brief at 2. Royal informed Jerry's Sport that "it was beneficial to Jerry's Sport's interest . . . to have independent counsel defend Jerry's Sport in the NAACP Action rather than have Jerry's Sport participate in a group or joint defense with other gun distributors named as defendants." *Id.* Royal informed Jerry's Sport that it had selected the firm of Leahey & Johnson because it had gun litigation experience against NAACP's counsel. *Id.* In its first reservation of rights letter, dated June 11, 2001, Royal confirmed that it had retained Leahey & Johnson, but with the caveat that Royal was in the process of reviewing coverage for the claim, that it was "providing this defense under a full Reservation of Rights[,]" which "means there is a possibility that coverage may not exist for this loss[,]" and that it was "reserving the right to seek reimbursement for any and all defense costs ultimately determined not to be covered." Reservation of Rights Letter, 6/15/01, at 1. Additionally, Royal stated, "[w]e are not telling you that this [referring to a future determination of no coverage] will occur, but we must advise you of the possibility." *Id.*[6] From these representations and actions, it appears that Royal was preparing for the possibility that a court would later determine there was coverage and, given that the claims may be potentially covered, Royal was exercising its right to defend under the policy.

**5.** The question of who determines whether there is potential coverage in the first instance once a claim is tendered, for purposes of triggering a legal duty to defend, is not addressed by the parties in this case but is, in our opinion, a critical first-step in this analysis.

**6.** In its second reservation of rights letter, dated July 12, 2001, Royal similarly indicated that it was providing a defense but again with the express caveat, (which was not present in the original insurance contract), that it would seek reimbursement of defense costs expended if a court later determined that there was no coverage. *See* Reservation of Rights Letter, 7/12/01, at 2.

¶ 23 On these facts, we conclude that Royal's duty to defend was triggered when it was faced with what it characterized (in its own letters and communications with Jerry's Sport) as potentially covered claims and when it activated its right to defend under the insurance contract by taking actions such as hiring counsel.

¶ 24 Importantly, by undertaking this duty to defend, Royal benefited by preserving its right to control the defense and its ability to take actions to mitigate any future indemnification responsibilities. As the Third Circuit explained in *Terra Nova:*

> Faced with uncertainty as to its duty to indemnify, an insurer offers a defense under reservation of rights to avoid the risks that an inept or lackadaisical defense of the underlying action may expose it to if it turns out there is a duty to indemnify. At the same time, the insurer wishes to preserve its right to contest the duty to indemnify if the defense is unsuccessful. Thus, such an offer is made at least as much for the insurer's own benefit as for the insured's. If the insurer could recover defense costs, the insured would be required to pay for the insurer's action in protecting itself against the estoppel to

deny coverage that would be implied if it undertook the defense without reservation.

*Terra Nova,* 887 F.2d at 1219–20.[7]

¶ 25 We agree that the insurer derives these benefits and protections when it decides to defend under a reservation of rights. Indeed, Royal did more than just hire counsel, as thoroughly explained in the trial court's own recitation of facts, *supra.* For example, Royal maintained involvement in the defense by, for example, hiring Concerco to evaluate the reasonableness of the legal costs and by authorizing its own adjusters to deviate from Royal's own fee guidelines when giving approval for payment of the fees. Certainly these actions benefited Royal to the extent that it maintained control over the defense and could take the opportunity to mitigate any potential future indemnification burdens.

¶ 26 Given these benefits to Royal and its exercise of its right to defend, we find that the trial court erred as a matter of law by concluding that Royal's undertaking of the defense pursuant to its reservation of rights letters created an implied contract, that Jerry's Sport was unjustly enriched by the provision of a defense by

---

7.  Similarly, the Supreme Court of Wyoming summarized as follows:

    The question as to whether there is a duty to defend an insured is a difficult one, but because that is the business of an insurance carrier, it is the insurance carrier's duty to make that decision. If an insurance carrier believes that no coverage exists, then it should deny its insured a defense at the beginning instead of defending and later attempting to recoup from its insured the costs of defending the underlying action. Where the insurance carrier is uncertain over insurance coverage for the underlying claim, the proper course is for the insurance carrier to tender a defense and seek a declaratory judgment as to coverage under the policy. However, to allow the insurer to force the insured into choosing between

    seeking a defense under the policy, and run the potential risk of having to pay for this defense if it is subsequently determined that no duty to defend existed, or giving up all meritorious claims that a duty to defend exists, places the insured in the position of making a Hobson's choice. Furthermore, endorsing such conduct is tantamount to allowing the insurer to extract a unilateral amendment to the insurance contract. If this became common practice, the insurance industry might extract coercive arrangements from their insureds, destroying the concept of liability and litigation insurance.

    *Shoshone First Bank v. Pacific Employers Ins. Co.,* 2 P.3d 510, 516 (Wyo.2000) (citation omitted).

Royal, and that Royal was entitled to reimbursement of attorneys fees under a quantum meruit theory. *See AmeriPro Search, Inc. v. Fleming Steel Co.*, 787 A.2d 988, 991 (Pa.Super.2001) (citation omitted) (explaining that quasi-contract imposes a duty, despite the absence of an agreement, "where one party receives unjust enrichment at the expense of another" and applies where the plaintiff confers benefits on a defendant, and the defendant appreciates, accepts, and retains those benefits "under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value"). Rather, it appears that undertaking the defense pursuant to a reservation of a right to reimbursement not contemplated in the written insurance contract was an attempt by Royal to unilaterally modify the written insurance contract (despite the fact that it was exercising, and benefiting from, its right to defend under the existing, written insurance contract).

¶ 27 As the Philadelphia Court of Common Pleas stated in *LA Weight Loss Ctrs., Inc. v. Lexington Ins. Co.*, 2006 WL 689109 (Com.Pl.2006):

> A reservation of rights letter does not create a contract allowing an insurer to recoup defense costs from its insured, but rather, is a mean[s] to assert defenses and exclusions which are already set forth in the policy. Certainly, if an insurer wishes to retain its right to seek reimbursement of defense costs in the event it later is determined that the underlying claim is not covered by the policy, the insurer is free to include such a term in its insurance contract. Absent such a provision in the policy, an insurer should not be permitted to unilaterally amend the policy by including the right to reimbursement in its reservation of rights letter.

*Id.* The *LA Weight Loss* court further noted the reasoning contained in *Terra Nova, supra,* finding that an insured is not unjustly enriched "when its insurer tenders a defense in order to protect its own interests, even if it is later determined that the insurer did not owe a defense." *Id.* at *7. We agree with, and adopt, this sound reasoning.

¶ 28 Indeed, one of the leading cases relied upon by the *LA Weight Loss* court is strikingly similar to the facts in the instant case and addresses essentially the same arguments raised by Royal herein. In *Midwest Sporting Goods, supra,* the insured ("Midwest") was sued by the City of Chicago and Cook County "for creating a public nuisance by selling guns to inappropriate purchasers." 293 Ill.Dec. 594, 828 N.E.2d at 1093. Midwest tendered the claim to its liability insurer, General Agents Insurance Company of America ("Gainsco"). *Id.* Gainsco indicated in a reservation of rights letter that it did not believe the claim was covered, but that it was providing Midwest a defense under a reservation of its asserted right to reimbursement of defense costs should a court later determine that there was no actual coverage. *Id.* at 594, 828 N.E.2d at 1094. Like Jerry's Sport in the instant case, Midwest accepted its insurer's provision of a defense. *Id.*

¶ 29 Approximately five months following that letter, Gainsco filed a declaratory judgment action which also asserted a right to reimbursement. *Id.* The trial court entered summary judgment in favor of Gainsco, determining that there was no coverage under the policy and later determining that Gainsco had properly reserved a right to reimbursement. *Id.* at 594, 828 N.E.2d at 1095–96. On appeal to the Supreme Court of Illinois, Midwest argued that Gainsco could not reserve a right to reimbursement that did not exist in the

written insurance policy, to which Gainsco responded (like Royal herein) that because the lower courts held that there was no actual coverage, the written insurance policy did not apply. *Id.* at 594, 828 N.E.2d at 1098. Gainsco further argued that, since it had no duty to defend, it was entitled to reimbursement. *Id.*

¶ 30 In determining whether Gainsco was entitled to reimbursement, the *Midwest* court examined the majority position espoused in other jurisdictions such as California in *Buss, supra,* and the Sixth Circuit in *United Nat'l Ins. Co. v. SST Fitness Corp.,* 309 F.3d 914 (6th Cir.2002), which are two cases relied upon by Royal. The *Midwest* court explained that *Buss, SST,* and other cases espousing the majority position found that "an insurer is entitled to reimbursement of defense costs . . . based upon a finding that there was a contract implied in fact or law, or a finding that the insured was unjustly enriched when its insurer paid defense costs for claims that were not covered by the insured's policy." *Midwest Sporting Goods,* 293 Ill.Dec. 594, 828 N.E.2d at 1101. The *Midwest* court agreed that, under the majority position, Gainsco would be entitled to reimbursement because it timely and expressly reserved its right to reimbursement, Midwest accepted payment of the defense costs without objection, and the subsequent declaratory judgment determined that there was no actual coverage. *Id.*

¶ 31 Nevertheless, the *Midwest* court followed the minority, yet persuasive, policy language based approach of other courts, such as the Supreme Court of Wyoming in *Shoshone, supra,* and the Third Circuit in *Terra Nova, supra,* which refused reimbursement under such circumstances. *Id.* In rejecting the majority approach of finding an implied contract and unjust enrichment, the *Midwest* court reit-

erated the position of *Shoshone, see supra* note 7, which characterized provision of a defense under a reservation of the right to reimbursement, should the court later declare no coverage, as an impermissible unilateral modification to the insurance contract placing the insured "in the position of making a Hobson's choice between accepting the insurer's additional conditions on its defense or losing its right to a defense from the insurer." *Midwest Sporting Goods,* 293 Ill.Dec. 594, 828 N.E.2d at 1102.

¶ 32 In further rejecting the unjust enrichment theory, the *Midwest* court recognized that when an insurer tenders a defense and pays attorneys fees under a reservation of rights, it is "protecting itself at least as much as it is protecting its insured." *Id.* The court concluded:

Thus, we cannot say that an insured is unjustly enriched when its insurer tenders a defense in order to protect its own interests, even if it is later determined that the insurer did not owe a defense. Certainly, if an insurer wishes to retain its right to seek reimbursement of defense costs in the event it later is determined that the underlying claim is not covered by the policy, the insurer is free to include such a term in its insurance contract. Absent such a provision in the policy, however, an insurer cannot later attempt to amend the policy by including the right to reimbursement in its reservation of rights letter.

Moreover, as the Supreme Court of Hawaii recognized, "affording an insured a defense under a reservation of rights agreement merely retains any defenses the insurer has under its policy; it does not relieve the insurer of the costs incurred in defending its insured where the insurer was obligated, in the first instance, to provide such a defense." *First Insurance Co. of Hawaii, Inc. v.*

*State of Hawaii,* 66 Haw. 413, 422, 665 P.2d 648, 654 (1983). Gainsco's reservation of rights letter could retain only those defenses that Gainsco had under its policy. Gainsco concedes that the insurance policies at issue did not provide for reimbursement of defense costs. Consequently, Gainsco's attempt to expand its reservation of rights to include the right to reimbursement must fail. *Id.* at 594, 828 N.E.2d at 1103. We agree with this sound reasoning and further conclude that, if Royal wanted to seek reimbursement of attorneys fees under the circumstances presented here, i.e., where the underlying claim may be potentially covered and Royal exercised its right to defend under the insurance contract, it could have included such a provision in the insurance contract along with its "duty and right to defend."

¶ 33 Finally, the *Midwest* court addressed the insurer's argument (which Royal raises herein) that the insurance contract did not govern because a court later determined there was no duty to defend. In this regard, the court responded:

> The problem with this argument is that Gainsco is attempting to define its duty to defend based upon the outcome of the declaratory judgment action. Although an insurer's duty to indemnify arises only after damages are fixed, the duty to defend arises as soon as damages are sought. *Central Illinois Light Co. v. Home Insurance Co.,* 213 Ill.2d 141, 158, 290 Ill.Dec. 155, 821 N.E.2d 206 (2004). As explained by the Court of Appeals for the Eighth Circuit:
>
> "Liberty remained obligated to defend [its insured] so long as there remained any question as to whether the underlying claims were covered by the policies. Upon determination that * * * the claims against [the insured] were there-

fore excluded from coverage, the district court properly concluded that Liberty's duty to defend [its insured] in this action expired. Because we conclude that Liberty had a duty to defend [its insured] until such determination was made, we reject Liberty's argument that it is entitled to reimbursement of defense costs." *Liberty Mutual Insurance Co. v. FAG Bearings Corp.,* 153 F.3d 919, 924 (8th Cir.1998).

> We find the analysis of the court in *Liberty Mutual* to be well taken. Although Gainsco implies that it has always maintained that it did not owe Midwest a defense in the underlying matter, we note that Gainsco's reservation of rights letter reveals some uncertainty concerning coverage. With regard to allegations in the underlying claim that Midwest was liable to the plaintiffs for various acts of intentional and/or willful conduct, Gainsco's reservation of rights letter stated that "the claim *may not be* covered under the Policy." (Emphasis added.) Given this uncertainty, Gainsco correctly agreed to pay Midwest's defense costs in the underlying action and sought a declaratory judgment that it did not owe Midwest a defense. Gainsco thus remained obligated to defend Midwest as long as any questions remained concerning whether the underlying claims were covered by the policies. Because Gainsco's obligation to defend continued until the trial court found that Gainsco did not owe Midwest a defense, Gainsco is not entitled to reimbursement of defense costs paid pending the trial court's order in the declaratory judgment action. The fact that the trial court ultimately found that the underlying claims against Midwest were not covered by the Gainsco policies does not entitle Gainsco to reimbursement of its defense costs.

*Id.* at 594, 828 N.E.2d at 1103–04. This same reasoning applies to Royal in the instant case. Royal was also uncertain as to coverage and indicated in its letters that there may be coverage, thereby conceding that there was potential coverage. Accordingly, its duty to defend was triggered and it exercised its right to defend to its own benefit, precluding a finding of unjust enrichment, as explained *supra.*

¶ 34 In this same vein, we also note that our analysis protects the long-standing common law rule that the duty to defend is broader than the duty to indemnify. *General Acc. Ins. Co. of America v. Allen,* 547 Pa. 693, 692 A.2d 1089, 1095 (1997) ("[T]he duty to defend is separate from and broader than the duty to indemnify...."); *Frog, Switch & Mfg. Co., Inc. v. Travelers Ins. Co.,* 193 F.3d 742, 746 (3d Cir.1999) ("An insurer's duty to defend an insured in litigation is broader than the duty to indemnify, in that the former duty arises whenever an underlying complaint may 'potentially' come within the insurance coverage."). As in the instant case, the duty to defend may be triggered even if it is later determined by a court that there is no actual coverage and, thus, no duty to indemnify. Thus, where the insurance contract is silent on the issue, permitting reimbursement of defense costs expended by an insurer exercising its right to defend potentially covered claims prior to a court's determination of no actual coverage or duty to indemnify would result in, essentially, retroactive erosion of the breadth of the duty to defend. This we refuse to do.

¶ 35 For the foregoing reasons, we reverse the judgment that granted reimbursement to Royal of defense costs it had incurred before the trial court's ruling that there was no actual coverage under the policy in the declaratory judgment action.

Accordingly, we need not address the remaining two issues in this appeal.

¶ 36 Judgment reversed.