J-A19006-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| THOMAS MORE MARRONE AND MAX PHILIP MARRONE | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellants | : | |
| | : | |
| v. | : | |
| | : | |
| | : | No. 2294 EDA 2020 |
| DANUTA MIELOCH | : | |

Appeal from the Judgment Entered January 14, 2021
In the Court of Common Pleas of Philadelphia County
Civil Division at No. 170903152

BEFORE:   DUBOW, J., MURRAY, J., and COLINS, J.[*]

MEMORANDUM BY MURRAY, J.:                **FILED OCTOBER 8, 2021**

Appellant, Thomas More Marrone, Esquire (Marrone),[1] appeals from the judgment entered in this replevin, trespass, and conversion action brought against Appellee, Danuta Mieloch, who is Marrone's estranged wife (Wife).  We affirm.

On April 9, 2017, the parties were involved in a domestic dispute which led to Marrone's arrest.[2]  On May 5, 2017, a temporary protection from abuse

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] Appellant Max Philip Marrone is Marrone's adult son.  Although a named party, Max Marrone has had minimal involvement in this case.  We reference Thomas Marrone as "Marrone," and both men collectively as "Appellants."

[2] The record does not provide further details about the arrest or any charges.

(TPFA) order was entered excluding Marrone from the couple's condominium (the Condo). Trial Court Opinion, 10/29/20, at 4-5.

In violation of the TPFA, Marrone went to the Condo several times to retrieve belongings, but took only a few items and refused to take the rest. *Id.* The parties thereafter arranged for Marrone to go to the Condo with a police escort to retrieve the remaining items. *Id.* at 6. Wife "carefully organized, hung and packed [Appellants'] personal belongings and neatly located them together in an area where Mr. Marrone could easily remove them." *Id.* On July 24, 2017, "Mr. Marrone did visit the Condo . . . with a police escort, driving there in a sedan apparently without a plan, capability or the intention to remove his [or his son's] personal property." *Id.* at 7. He took only a few things. *Id.*

At the advice of police, Wife rented a storage unit in Marrone's name, paid to move Appellants' belongings to the unit, and paid the fees on the unit for approximately 11 months. *Id.* at 7-10. Marrone knew about Wife's actions but refused a key to the unit and made no attempt to remove the belongings. *Id.* at 9-10. Instead,

> Mr. Marrone in what appears to be an unseemly spurious litigation (and intimidation) tactic, responded by accusing [Wife] of "identity theft" for causing the storage unit to be placed in his name, despite [the fact] that she provided no private Information in doing so and did not reveal his date of birth, social security number, bank account number or credit card information. Mr. Marrone reported the alleged "identity theft" to the police and FTC under the Fair Credit Reporting Act and by sending a letter along with the identity theft report to the storage facility on August 23, 2018.

On September 20, 2017, Mr. Marrone, in a separate action in this [c]ourt, filed an Emergency Petition seeking a Preliminary Injunction to have the [c]ourt order [Wife] to move his personal property from the storage unit back to the Condo's on-site storage unit, and other relief related to executing certain insurance proceed checks. On September 21, 2017, the [c]ourt entered an Order dismissing the Petition on the merits and closing the case, giving notice that the Order was a Final Order. Mr. Marrone did not appeal the dismissal of his action for injunctive relief.

Six days later, on September 27, 2017, Mr. Marrone filed this action seeking the same previously denied relief and asserting claims for replevin, trespass to chattels and conversion. Despite enjoying the free pre-paid storage and having no opposition accessing or freely using his personal property, Mr. Marrone irrationally refused the storage unit key, refused to obtain his property and ultimately refused to exercise any responsibility for or control over the property. Mr. Marrone elected to place his rights to the property at issue in this action and included a claim for injunctive relief requiring [Wife] to formally move his property into storage in the [Condo], relief to which he had already been denied. However, having failed to prevail on his emergency petition for that relief, Mr. Marrone again took no steps to recover or secure his property or exert dominion over it, but rather, elected to pursue a protracted, unreasonable and abusive litigious course of preliminary objections, discovery motions, multiple motions and other tactics that obstructed the fair and efficient progress of the matter and trial on the merits in this matter.

Mr. Marrone's unreasonable and bad faith actions in refusing the key and declining to access or move his property, if he so chose, are inconsistent with the assertion of a possessory right over the property, leading to the conclusion that the non-credible self-hyper-valuation, and purported sentimental value based upon his identity theft claim and the institution of this and numerous other legal actions against [Wife] and her attorneys are the product of tactical posturing and a protracted litigation strategy rather than an honest desire to immediately secure possessions and protect their alleged value. **Mr. Marrone conceded that his only reason for leaving the property at the storage unit for so long was a litigation posture** (in other words, Mr. Marrone elected to exploit the court process and the self-inflicted "damages" and status of his property to try to pervert this action

- 3 -

into an economic profit center for him and win at all costs, regardless of the status of the "priceless" property).

*Id.* at 11-13 (footnote, record citations, and paragraph numbers omitted; paragraphs modified and emphasis added).

The case proceeded to a bench trial on October 7, 2020. On October 29, 2020, the trial court issued an order dismissing Appellants' complaint, as well as a comprehensive 33-page opinion detailing Marrone's actions and explaining the ruling in Wife's favor. The court referenced Marrone's "blatant misrepresentation" that was "unfortunately consistent with Mr. Marrone's . . . conduct and misuse of the [c]ourt[.]" *Id.* at 4, n.2. The court expressly found Marrone lacked credibility and described his claims as "specious." *Id.* at 11-12, 21. It concluded:

> The [c]ourt finds Mr. Marrone's testimony, in viewing it in totality, apparent self-interest, content and demeanor at trial, rendered him wholly non credible as a witness and the disproportionate amount of the conduct of litigation of dubious claims in this matter of record and the continuing evidence of truculent litigation posturing, unnecessarily contentiousness communication of counsel, *e.g.* in email exchanges and correspondence submitted of record, patent abuse of process and the perversion of this action into petty revenge seeking vehicle was and is a misuse of the [c]ourt.

*Id.* at 21.

Appellants filed unsuccessful post-trial motions; they then filed this appeal.[3] The trial court ordered a Pa.R.A.P. 1925(b) concise statement. In response, Appellants filed a 6-page statement listing 18 issues.[4]

The abuse of the court process continues in this appeal. Although there were only three witnesses at the one-day bench trial, Appellants raise 16 issues and their brief exceeds 80 pages. *See Commonwealth v. Small*, 980 A.2d 549, 565 (Pa. 2009) (where appellant raised 18 issues, Supreme Court noted "appellate advocacy is measured by effectiveness, not loquaciousness," and "volume on this scale numbs the reader and such quantity bespeaks a lack of quality.").

In addition, the brief contains numerous deficiencies which impede appellate review. The 5-page, 16-issue statement of questions relates only loosely to the argument. *See* Appellants' Brief at 5-10, 41-73. Rule 2119 requires that the argument be "divided into as many parts as there are

---

[3] Appellants purported to appeal from the order denying their post-trial motions. However, an appeal is properly taken from the entry of judgment. Appellants praeciped for entry of judgment on January 14, 2021, and thus jurisdiction has been perfected. *See* Pa.R.A.P. 905(a); *American and Foreign Ins. Co. v. Jerry's Sport Center, Inc.*, 948 A.2d 834, 842 n. 1 (Pa. Super. 2008) (a praecipe for the entry of judgment will perfect jurisdiction after an appeal is filed).

[4] The statement is not concise or compliant with the Rules. *See* Pa.R.A.P. 1925(b)(4). Moreover, most of the claims are unpreserved and waived. *See Kanter v. Epstein*, 866 A.2d 394, 401 (Pa. Super. 2004) (finding waiver where Rule 1925(b) statement contained numerous issues which "circumvented the meaning and purpose of Rule 1925(b)" and "effectively precluded appellate review").

questions to be argued." *See* Pa.R.A.P. 2119(a). Appellants' argument is disorganized and repetitive. *See e.g.* Appellants' Brief at pages 49-59 (conflating issues 5, 6, and 9), 62-73 (conflating issues 13 and 15). Further, 11 of the 16 issues are unpreserved either because they were not sufficiently pled in the complaint,[5] were not raised in post-trial motions,[6] and/or are undeveloped. *See e.g., Zitney v. Appalachian Timber Products, Inc.*, 72 A.3d 281, 290-91 (Pa. Super. 2013) (citation omitted) ("If a plaintiff fails properly to plead a separate cause of action, the cause he did not plead is waived."); *see also Lenhart v. Cigna Companies*, 824 A.2d 1193, 1196 (Pa. Super. 2003) (Pa.R.Civ.P. 227.1(c)(2) requires post-trial motions to preserve issues for appellate review of a decision "in the case of a trial without jury"; issues not raised in post-trial motions are waived). Appellants have not included a "statement of place of raising or preserving of issues" as required by Pa.R.A.P. 2117(c) and 2119(e). The record in this case is nearly 6,000 pages. It is "not the responsibility of this Court to scour the record to prove that an appellant has raised an issue before the trial court, thereby preserving

---

[5] Appellants did not plead a cause of action as to issues 8 and 10 (damages to property caused by negligence of movers and identity theft). *See* Amended Complaint, 10/2/19, at 12-18; Appellants' Brief at 6-7.

[6] Issues 2, 3, 4, 5, 10, 12, 13, 14, 15, and 16 were not raised in post-trial motions. *See* Motion for Post-Trial Relief, 11/12/20, at 1-8; Appellants' Brief at 5-10.

it for appellate review." ***Commonwealth v. Baker***, 963 A.2d 495, 502 n. 5 and n. 6 (Pa. Super. 2008) (citation omitted). We have explained:

> The Rules of Appellate Procedure state unequivocally that **each question an appellant raises is to be supported by discussion and analysis of <u>pertinent authority</u>**. Appellate arguments which fail to adhere to these rules may be considered waived, and arguments which are not appropriately developed are waived. Arguments not appropriately developed include those where the party has failed to cite any authority in support of a contention. This Court will not act as counsel and will not develop arguments on behalf of an appellant. Moreover . . . the Commonwealth Court . . . has aptly noted that mere issue spotting without analysis or legal citation to support an assertion precludes our appellate review of a matter.

***Coulter v. Ramsden***, 94 A.3d 1080, 1088-89 (Pa. Super. 2014) (bold and underline emphasis added).

Appellants essentially argue facts in a light most favorable to themselves — rather than Wife, who was the verdict winner — and attempt to retry the case and/or impugn the trial judge. Much of the argument lacks citation to pertinent authority or cites only general, boilerplate law, such that Appellants have failed to develop meaningful legal argument for review. In sum, Appellants have waived 11 issues, with the exception of issue 1 (relating to trespass), issues 6, 7, and 11 (relating to damages), and issue 9 (relating to collateral estoppel).

With respect to the remaining 5 issues, the Honorable James C. Crumlish, III, sitting as the trial court, addresses the merits and explains: (1) Appellants did not "address the Replevin cause of action and remedies or basis for injunctive relief" at trial; (2) even if Appellants had made out a case for

injunctive relief, they are collaterally estopped from pursuing it based on the final order dismissing this claim in **Marrone v. Kuestner**, CCP No. 190501037; (3) the evidence was insufficient to sustain a claim for trespass to chattels; (4) the evidence was insufficient to sustain a claim for conversion; and (5) Appellants are not entitled to damages. **See** Trial Court Opinion, 10/29/20, at 2, 4-32; **see also** Restatement (Second) of Torts §§ 217, 218; **Martine v. National Sur. Corp.**, 262 A.2d 672, 675 (Pa. 1970). Accordingly, we affirm Appellants' preserved claims on the basis of the trial court's well-reasoned opinion. The parties shall attach a copy of the October 29, 2020 opinion to any relevant future pleadings in this case.

Judgment affirmed.

Judge Colins joins the memorandum.

Judge Dubow did not participate in the consideration or decision of this case.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/8/2021

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

THOMAS MORE MARRONE and :
MAX PHILIP MARRONE, : COURT OF COMMON PLEAS
: PHILADELPHIA COUNTY
          Plaintiffs, :
:
  v, :
:
DANUTA MIELOCH, : No. 170903152
:
        Defendant. :
:

## MEMORANDUM OPINION

This an action in Replevin, Equity and Tort to physically recover possession of (or obtain monetary damages for the alleged loss of or damage to) various items of Plaintiffs' personal property in the form of furniture, rugs, framed items, trophies, personal papers and files and other goods formerly located at the previously shared and jointly owned condominium (the "Condo") residence of Plaintiff Thomas More Marrone and Defendant Danuta Mieloch. As of the date of trial the personal property had remained in a commercial storage unit since July 29, 2017 near the jointly owned residence. The operative Second Amended Complaint also contains claims for trespass to chattels and conversion as to the property referred to above. Prior to trial, the Court conducted a Pretrial Conference with counsel to the parties in which all discussed the anticipated conduct of Trial, anticipated witnesses and addressed arguments relating to the parties' contentions *In Limine* regarding relating Family Court records as potential evidence relating to a domestic law proceeding between Ms. Mieloch and Mr. Thomas Marrone which previously resulted in the entry by the Family Court of a PFA Injunction

against Plaintiff Thomas Marrone, an order related to his prior arrest and detention by the Philadelphia Police relating to criminal charges of domestic violence against Mieloch.

Counsel to the parties concurred that witnesses at trial consisted of the parties themselves, and no additional witnesses or experts were necessary. Counsel for the parties agreed that the focus of the trial involved the status and recovery of personal property of Thomas Marrone and his son Max Marrone and the circumstances of its removal from the Condo of Mr. Marrone and Ms. Mieloch, placement into the commercial storage unit and alleged damages to the Plaintiffs' property stemming from that removal and continuing storage of same, making it primarily a Replevin action. In their proposed findings of fact and conclusions of law, Plaintiffs chose not to address the Replevin cause of action and remedies or basis for Injunctive relief but instead, advance arguments in support of tort claims for trespass to chattels and conversion and, simply, without any discussion, request that the Court enter judgment on Count I (the Replevin Count) of their Amended Complaint.

This matter originates in a contentious domestic dispute and litigation that originated in April 2017 and that led first to Defendant's arrest and subsequently to the issuance in Defendant's favor of a Protection from Abuse Order the existence of which are matters of public record and outlined in numerous lawsuits Mr. Marrone has filed in this Court and referred to by both parties. Both Mr. Marrone and Ms. Mieloch insisted on offering arguments, evidence and testimony relating to that domestic law proceeding. The details, contents and alleged merits of the Family Court proceedings or culpability of the parties the Court determined are not of probative in or relevant to the civil action before this Court. This domestic dispute does not relate to Mr. Max Marrone's claims for return of his property and his

2

alleged damages to his personal property at all. The relevance of the prior history as far as this dispute is limited to the undisputed facts that Plaintiff Thomas Marrone was subject to a PFA Order for nearly three years and Ordered to stay away from Defendant and barred from access to the formerly shared Condo. As a result of the Domestic Court PFA, Plaintiff for three years lost the right to immediate possession of his property that resided within the Condo. This Court advised the parties that it would not rely upon the PFA proceeding, did not intend this action to become an opportunity to re-litigate the deeply emotional disputes involving the parties to that action and was not going to review or apply a reconsideration standard to that record[1]. Despite the court's admonition, Plaintiffs have submitted numerous transcripts of the PFA proceedings, which while records of that Court action, are of questionable relevance to facts and controlling law in this matter and do not assist the Court in addressing the tort claims and Replevin claims at issue herein. Plaintiffs have also, despite the Court's admonitions, included in the Proposed Findings of Fact and Conclusions of Law statements made by the Family Court in reference to those proceedings which have, as the Court has determined, no bearing on the causes of action in this case and appear to be gratuitous attempts to blacken the reputation Ms. Mieloch and somehow provide therapeutic absolution for Mr. Marrone. As the Court advised, it is unwilling to follow Plaintiffs into the darkness or palpable animus related to the issuance of the TPFA.

## FINDINGS OF FACT

---

[1] The Court takes notice of the large number of interrelated actions brought by Mr. Thomas Marrone Esq. in this Court that would require a "yarn map" to sort out the dizzying array of defendants and spinoff actions undertaken during the pendency of this action all reflecting a concerning pattern of litigiousness by Mr. Marrone.

3

This Court conducted a non-jury trial in this matter on October 7, 2020.[2] At the close of the testimony, the parties moved into evidence their exhibits without objection and rested. The Court directed the parties submit proposed findings of fact and conclusions of law. The Court has carefully considered all of the testimony and documentary evidence presented at the trial and admitted into evidence and conducted an analysis of the record with the benefit of the pleadings, briefs and written submissions of proposed facts and conclusions of law. As of trier of fact in this matter, the Court makes the findings set forth below:

1. Thomas More Marrone (Mr. Marrone) and Ms. Mieloch were co-owners of a luxury condominium at 1234 Hamilton St., Unit 304-305, Philadelphia, Pennsylvania ("the Condo").

2. The consolidated Condo unit consisted of 55-5700 sq. ft., a storage area outside of the loft, two bedrooms, a backroom, a TV room, a sitting room, its own freight elevator and three parking spots.

3. Mr. Max Marrone is the son of Mr. Thomas Marrone and a resident of Brooklyn, NY since 2014.

---

[2] At the outset of the trial, the Court addressed with the parties the list of witnesses. One of Plaintiff's proposed witnesses was identified as Ron Morton, an employee of US Storage, whom Plaintiff proposed to proffer to testify concerning the storage contract and the amount of the outstanding unpaid storage fees. The parties agreed to stipulate that Mr. Marrone did not sign the storage contract that had it did have his name on it and that he personally was not the one who contracted to open the storage unit. They also stipulated that an amount of approximately $6,000 in storage fees was due and owing as of the date of trial. Plaintiff now suggests that "the Court dismissed US Storage's representative, Ron Morton from testifying ..." inferring that the Court prevented Plaintiff from presenting evidence in his favor. This blatant misrepresentation by counsel for Plaintiffs, is unfortunately consistent with Mr. Marrone's (by his counsel's) litigation conduct and misuse of the Court throughout this matter and in matters as above reference. The Court only requested the stipulation from Defendant after Plaintiffs identified the above two issues as the only matters about which Plaintiffs planned to have Mr. Morton testify. At no time did Plaintiffs suggest that Mr. Morton would be called to offer evidence on Mr. Marrone's purported identity theft theory and clearly is a post-trial after thought after the parties rested in their case at trail

4

4. Mr. Marrone and Ms. Mieloch purchased the Condo in 2014 and resided there together until April 2017.

5. At that time, Mr. Marrone and Ms. Mieloch were involved in a volatile domestic dispute for which Mr. Marrone was arrested on April 9,2017 (and sentenced to a diversionary program) and thereafter that ongoing domestic dispute culminated in the issuance of a Temporary Protection from Abuse Order (TPFA) on May 5, 2017 that excluded Mr. Marrone from the Condo and separated him from his possessions. (Defendant's Exhibit 3).[i]

6. Mr. Marrone contested the TPFA, but the Order(s) was/were not vacated by the Family Court until August 12, 2020.

7. Mr. Marrone did not have access to his personal property within the Condo while the TPFA Order was in effect.

8. Mr. Marrone made multiple requests through counsel and elsewise to visit the Condo to access various personal items.

9. At one point in May, Mr. Thomas Marrone came with a police escort to the Condo building with a "U-Haul trailer" but he removed only a coffeemaker and 9 coffee cups (for unexplained reasons that Plaintiffs have failed to address).

10. Mr. Marrone denied he had visited the Condo, but the Court finds his testimony is not credible and that of Ms. Mieloch is credible.

11. In May of 2017, Mr. Marrone declined to move his other property that remained in the Condo or make arrangements for its transfer to another location of his choosing.

5

12. Between April and July, 2017, Mr. Marrone came to the Condominium several times (see Finding no. 10, above).

13. Additionally, Mr. Marrone regularly came to the Condominium building to use one of the parking spots and obtain his mail.

14. Mr. Marrone had the ability to remotely access surveillance video cameras in the building and parking area because of holding some position in the Condo Association.

15. To address Mr. Marrone's continuing requests for access, the parties entered into an agreement in the PFA proceeding setting a specific date upon which Mr. Marrone was permitted to come to the Condo with a police escort to remove his personal property.

16. The date set for Mr. Marrone to come to the Condo was July 24, 2017.

17. Prior to Mr. Marrone's scheduled visit, Ms. Mieloch carefully organized, hung and packed Mr. Marrone's personal belongings and neatly located them together in an area where Mr. Marrone could easily remove them.

18. Photographs entered into evidence (Defendant's Exhibit 54) visibly confirm the careful manner in which Ms. Mieloch assembled Mr. Marrone's property and confirm the credibility of Defendant's testimony regarding her careful treatment of Mr. Marrone's personal property and undermine Plaintiffs' accusations of negligence regarding Ms. Mieloch's alleged tortious intentions regarding the property.

6

19. Mr. Marrone did visit the Condo on July 24, 2017 with a police escort, driving there in a sedan apparently without a plan, capability or intention to remove his personal property.

20. Mr. Marrone claimed in testimony not to recall seeing the items packed up, even when confronted with the photograph, and his testimony on this matter is so lacking credibility as to undermine the credibility of all of his self-serving testimony and the claims asserted herein.

21. Mr. Marrone only took a few things with him at the July visit.

22. During the visit, Ms. Mieloch testified credibly that she spoke with police and reported that one or more of the officers advised her to remove the items to a commercial storage facility.

23. The Court does not exclude this testimony from Defendant as hearsay as its weight goes to Ms. Mieloch's state of mind forming the basis of her belief (originating in this conversation) that moving Mr. Marrone's property to storage was a safer possible option to avoid the disruption of repeated visits and potentially escalating confrontations between the parties from future contentious requests and visits from Mr. Marrone.

24. Ms. Mieloch did not seek permission from Mr. Marrone or his counsel to remove the property that she had organized, packed and assembled and some of which Mr. Marrone had preivously packed up.

25. Ms. Mieloch testified to her belief that, by placing the property in a commercial storage unit that she had put in Mr. Marrone's name and for which she prepaid the

7

rental for three months, he would have immediate and easy access to his personal property at his convenience without the necessity of contact with her or violating the PFA .

26. The Court finds Ms. Mieloch's testimony regarding her actions with respect to the property credible and consistent with her careful assemblage of the items as photographed in Exhibit 54 in advance of Mr. Marrone's visit to the Condo with a police escort on July 24, 2017.

27. Ms. Mieloch's consistent and credible testimony demonstrated that she had no intention to ever assert dominion or possession of Mr. Marrone's or Max Marrone's property or to prevent or obstruct them from gaining possession of it.

28. The Court also finds credible Ms. Mieloch's testimony that some of the personal items that Mr. Marrone claimed to have received from his late father were left abandoned in trash bags at the curb outside of his father's house after its foreclosure.

29. Mr. Marrone's claim that the condition of these items was pristine is not credible; to the contrary, the acquisition of the property from trash bags at the curb supports the suggestion that he obtained the property in a previously damaged condition.

30. Upon obtaining property and mementos curbside from his father's house, Mr. Marrone packed them in plastic storage containers.

31. Ms. Mieloch credibly testified that she did not unpack any of Mr. Marrone's property that he had already placed in storage containers, but simply moved them

8

to the area of the Condo where she gathered his property for his removal on July 24, 2017.

32. Ms. Mieloch hired movers through one of her employees and reasonably relied upon that employee to vouch for the competence of the movers.

33. Mr. Marrone became aware that his property was being moved on July 29, 2017, when he was viewing his surveillance of the garage area of the building and observed movers moving property coming out of the elevator dedicated to his unit.

34. Mr. Marrone drove to the Condo and observed the movers loading his property onto a truck.

35. Mr. Marrone called the police but did not seek to assert dominion over his property or otherwise ever direct the movers to desist or to redirect the property to a location of his choosing.

36. Mr. Marrone followed the truck to the storage unit, even entering the storage unit building and following his property to the area of the storage unit.

37. Plaintiffs produced no evidence at trial regarding the movers despite the fulsome opportunity to conduct pretrial discovery, or that Defendant had negligently engaged the third party moving company.

38. Plaintiffs have brought no claims against the third party movers (to this Court's knowledge) for their alleged negligent handling of Plaintiffs' property or provided credible evidence that any conduct by them was the cause in fact of damages to Plaintiffs property.

9

39. Mr. Marrone made no efforts to address the placement or treatment of his property at the commercial storage facility despite his personal observation of its removal and the location of its placement during or after the move.

40. Ms. Mieloch secured the commercial storage unit by truthfully identifying the owner of personal property in storage as Thomas Marrone and placing the storage unit in his name.

41. Ms. Mieloch did not provide the facility with any personal protected information of Mr. Marrone's when she had the storage unit opened in his name and provided his contact information.

42. Ms. Mieloch reasonably and immediately attempted to provide the key to the storage unit to Mr. Marrone in order to ensure Mr. Marrone's unlimited access and rights to his property.

43. Ms. Mieloch was fully transparent as to the location of the property and the means to access the storage unit and her counsel offered the key to Mr. Marrone's counsel on numerous occasions, including sending the key directly to the then attorney for Mr. Marrone by mail.

44. Ms. Mieloch advised Mr. Marrone, knowing that he was experiencing financial difficulties and was unable to meet his own minimum living expenses, that she had paid the fee to place the personal property in the storage unit and deposited sufficient funds for the property to remain there for at least three months.

45. Ultimately, Ms. Mieloch paid the storage fee for 11 months; she credibly testified that believed that she was acting charitably to Mr. Marrone.

10

46. The Court does not find anything in Ms. Mieloch's conduct directed to intentionally and recklessly disregarding Mr. Marrone's rights or evidencing bad faith, but rather her conduct was devoid of any malicious motive and for the purpose of providing him, from the time of transport to, and during its continued presence in, the storage unit, with dominion, control and access to his personal property.

47. Mr. Marrone in what appears to be an unseemly spurious litigation (and intimidation) tactic, responded by accusing Ms. Mieloch of "identity theft" for causing the storage unit to be placed in his name, despite that she provided no private information in doing so and did not reveal his date of birth, social security number, bank account number or credit card information.

48. Mr. Marrone reported the alleged "identity theft" to the police and FTC under the Fair Credit Reporting Act and by sending a letter along with the identity theft report to the storage facility on August 23, 2018.[3]

49. On September 20, 2017, Mr. Marrone in a separate action in this Court, filed an Emergency Petition seeking a Preliminary Injunction to have the Court order Ms. Mieloch to move his personal property from the storage unit back to the Condo's

---

[3] Marrone now speciously claims that he sent the identity theft letter to the storage unit "to mitigate his damages by preventing his personal property and that of Max Marrone from being sold at auction." (Plaintiff's Proposed Finding of Fact no. 18. As support for this position, Marrone references his Trial Exhibit 8, which consists of a self-serving email sent to Ron Morton at the storage unit facility, attaching a self-serving letter to the FTC referencing his identity theft claim and suggesting that he bore no responsibility for the debt arising out of the cost of the storage unit. The existence of the letter may be a fact, but the Court cannot conclude that Mr. Marrone sent it "to mitigate his damages," because such assertions were not addressed at trial by Mr. Marrone, and further the question of Mr. Marrone's credibility, motive and purported advice of counsel in sending the communication was not part of his testimony, is not apparent on the face of the document and is dubious in light of his accusing Ms. Mieloch of "stealing" his identity.

11

on-site storage unit and other relief related to executing certain insurance proceed checks (Docket No. 170902080).

50. On September 21, 2017, the Court entered an Order dismissing the Petition on the merits and closing the case, giving notice that the Order was a Final Order.

51. Mr. Marrone did not appeal the dismissal of his action for injunctive relief.

52. Six days later, on September 27, 2017, Mr. Marrone filed this action seeking the same previously denied relief and asserting claims for replevin, trespass to chattels and conversion.

53. Despite enjoying the free pre-paid storage and having no opposition accessing or freely using his personal property, Mr. Marrone irrationally refused the storage unit key, refused to obtain his property and ultimately refused to exercise any responsibility for or control over the property.

54. Mr. Marrone elected to place his rights to the property at issue in this action and included a claim for injunctive relief requiring Ms. Mieloch to formally move his property into storage in the Unit, relief to which he had already been denied.

55. However, having failed to prevail on his emergency petition for that relief, Mr. Marrone again, took no steps to recover or secure his property or exert dominion over it, but, rather, elected to pursue a protracted, unreasonable and abusive litigious course of preliminary objections, discovery motions, multiple motions and other tactics that obstructed the fair and efficient progress of the matter and trial on the merits in this matter.

12

56. Mr. Marrone's unreasonable and bad faith actions in refusing the key and declining to access or move his property, if he so chose, are inconsistent with the assertion of a possessory right over the property, leading to the conclusion that the non-credible self-hyper-valuation, and purported sentimental value based upon his identity theft claim and the institution of this and numerous other legal actions against Ms. Mieloch and her attorneys are the product of tactical posturing and a protracted litigation strategy rather than an honest desire to immediately secure possessions and protect their alleged value.

57. Mr. Marrone conceded that his only reason for leaving the property at the storage unit for so long was a litigation posture (in other words, Mr. Marrone elected to exploit the court process and the self-inflicted "damages" and status of his property to try to pervert this action into an economic profit center for him and win at all costs, regardless of the status of the "priceless" property.

58. Mr. Marrone remained arbitrarily insistent that the property be returned to the Condo and retained there despite that he had no occupancy rights in the Condo at the time, asserting he had a right to store his property "rent free," and despite that he had already failed to prevail in obtaining an injunction to force Defendant to move and store his property.

59. Ultimately the matter was listed for trial in September 2019.

60. The Court ordered the parties to visit the storage unit and the Marrones to take an inventory of the property in the storage unit.

13

61. Mr. Marrone did not visit the storage unit at any time between July 29, 2017 when his possessions were located there and September 2019 when ordered to do so by the court.

62. The fact that Mr. Marrone has had no "need" to access his "invaluable", "priceless" and "sentimental possessions" during the lengthy pendency of this litigation but sought to go to the Condo multiple times before the move (and took little with him) casts doubt on his credibility regarding the purported and unproven value of his property in the storage unit and its importance to him and supports Ms. Mieloch's contention that the visits and requests for access (prior to moving the property to storage) were more about disrupting her life than legitimately needing his property.

63. The Court finds credible that Ms. Mieloch had a reasonable concern that Mr. Marrone would continue to seek pre-textual entry into the Condo, with his property being the excuse, if the property had remained there.

64. The parties went to the storage unit with their counsel along with a videographer hired by Defendant and William Underkoffler, a Public Adjuster (PA) of Metro Public Adjusters engaged by the Marrones.

65. The Court has viewed portions of the videotape entered into evidence from this visit and observed Mr. Marrone audibly and gesturing prompting his son Max Marrone to claim damages to property of Max's, where Max on his own had not observed any damages.

66. Following the visit, Plaintiffs filed an amended complaint purporting to list items of lost and damaged property amounting to five million dollars.

14

67. At the trial, Plaintiffs' counsel directed them through the listed items in the Second Amended Complaint, eliciting them to arbitrarily assign a "value" to each representing their loss.

68. Plaintiff's now post-trial argue that they rely upon the bare laundry list of damage allegations, as pled in the Second Amended Complaint, and as averred in that Complaint to be the basis of the award of damages without foundation of record, expert or competent, credible supporting testimonial evidence to prove their claimed damages.

69. The Court finds that Plaintiffs have not sustained their burden of proof to establish a basis for a money award for their claims for alleged damages to and for their personal property.

70. Mr. Marrone conceded that he personally assigned the values to the damages or losses based upon his own opinion untethered to foundational evidence, styling himself (a practicing litigation attorney) as an expert in the self-valuation of his own property.

71. Plaintiffs stipulated, as no expert was identified in discovery as required under the Case Management Order nor Expert Report provided, that they were not offering Mr. Marrone as an "expert" on value, but nevertheless asserted that he was competent, without any factual foundation, documentation or qualification, to provide the purported valuations.

72. Plaintiffs did not provide any invoices, repair estimates or any documentation showing the value of the property, records of when and by whom purchased, any

15

photographs showing the condition of the property prior to its removal from the Condo or even any appraisal of the historic or current "market" value of the property.

73. Plaintiffs' claim also confusingly intermixed property that they did not own or claim title to as part of their amorphous damage claims.

74. Tellingly, despite having retained a damage and valuation expert and bringing Mr. Undercoffler PA to the storage unit to examine the property with him, Plaintiff elected not to call Mr. Undercoffler as a witness at trial or to provide any expert report.

75. As a result of Plaintiffs' failure to call Mr. Undercoffler PA, the Court must infer that he would not support or confirm in testimony the subjective, inflated and arbitrary "market", "sentimental" or "repair" values that Mr. Marrone assigned to the property (after years of litigation) and the Court adopts a negative inference based upon the failure of calling this witness to testify or provide an expert opinion as to the cause in fact of the alleged property damages..

76. Ms. Mieloch also testified regarding the historic condition of specific items of Mr. Marrone's property: for example,"Tibetan/Nepalese" rugs that he complained were inexpertly rolled up and stored in that matter.

77. Ms. Mieloch credibly testified the rugs prior to their transport to the storage unit were already damaged and rolled up and stored at the Condo that way by Mr. Marrone and transported unchanged from the Condo; the desk chair that Mr. Marrone claimed was damaged in transport or storage, was damaged in use by

16

Marrone and further she credibly testified had the armrests on furniture were ripped out by Mr. Marrone's pet cat and damage to other property was the result of this incontinent aging pet cat and/or that his father's abandoned property was left in trash bags at curbside at the fathers home.

78. Mr. Marrone did not credibly deny that the "Tibetan/Nepalese" rugs were already rolled up and stored at the Condo and at trial there was no evidence that they had been unfurled and ever examined by Plaintiff Mr. Marrone to inspect for alleged damage.

79. Ms. Mieloch testified credibly that Mr. Marrone did not visit his father when he was in a nursing home, lending credence to her claim that he allowed his father's house to go into foreclosure, resulting in the father's possessions being hurriedly collected in trash bags and left at the curbside.

80. Video from the inspectionat the storage unit casts serious doubt and lack of evidence as to Plaintiff's claims of the condition of and extent of alleged property of property damage and what occasioned such damage.

81. Plaintiffs did not offer any credible or competent evidence on the purported "market value" of the property, its condition before it was moved to the storage unit, damages that occurred in transit, or alleged diminution in value related to the storage.

82. The evidence contained in Plaintiffs' testimony is self-serving, subjective, and speculative, with Mr. Marrone appear to pull valuation numbers "out of the air" to assign value to his belongings.

17

83. Plaintiffs did not take any of their property to a competent restoration or repair shop for evaluation or present estimates for the cost of allegedly needed repairs.

84. Plaintiff's testimony does not provide the Court with any factual basis to determine the condition of the property prior to July 29, 2017 or the condition of the property following its transport to the storage facility as compared with the condition of the property today.

85. The Court finds that Defendant's cross examination of Mr. Marrone and Plaintiff's direct testimony as to claimed damages demonstrated beyond peradventure that Mr. Marrone had no legitimate expertise or qualifications to render any credible opinion as to claimed damages and his testimony was purely self-serving and speculative.

86. Based upon the evidence of record, the Court is incapable of concluding by a preponderance of the evidence that any changes to the property claimed as damages or its condition occurred that are attributable to the conduct of the Defendant.

87. The Court has found no competent evidence that would permit it to place any value on Plaintiff's claims or to calculate damages.

88. Mr. Marrone took no steps to recover his property or to assert his possessory rights by exercising control over it for the entirety of this litigation, opting to leave the question of the propriety of his actions to the Court.

18

89. The Court finds Mr. Marrone's conduct and failure or refusal to recover his property was not a function of its transfer to the commercial storage unit but rather his apparent weaponization of it to further his litigation strategy.

90. Plaintiffs after trial (and without even a mention or allusion to it during trial) claim the purported loss of a "security camera," without evidential support, arbitrarily valued by Plaintiff at $3,000,000; however, this claim was purposefully abandoned at trial and no evidence was presented regarding it. The Court is unwilling to reopen the record to consider any additional afterthought claims.

91. Plaintiff's testimony regarding the purported value of property at trial was irrational and without any competent evidence of record supporting the self-serving and preposterous valuation of the value of or alleged damages to lost, missing or damaged property.

92. The Testimony of Mr. Max Marrone as to damages or his purported lost property was not credible as the video introduced of record of the parties visit to the storage unit was clearly and audibly coached by Mr. Thomas.

93. At his visit to the storage unit, Mr. Max Marrone was given complete access to his property including "books" and alleged memorabilia and he did not take any of them.

94. Further the court could find no basis to value his books or alleged damage or his more significant damage claims to a lost "Play Station" controller or an alleged missing vintage typewriter that was a gift to him from Defendant Meiloch.

19

95. In the totality of this action, and the paucity of any evidence supporting a damage claim as to his property (and his very limited, if any, occupancy of the Condo given his testimony at trial that he had resided in Brooklyn since 2014), the Court is puzzled that Mr. Max Marrone is even a Plaintiff in this action.

96. Mr. Thomas Marrone's conduct in this action amounted to the abandonment in fact of his personal property for over three years and indefensible indifference to the storage conditions of the storage unit that may be inferred to be an admission by him that his property was not "priceless," "invaluable" or worth "millions" as he claimed.

97. Plaintiffs did not prove by a preponderance of the evidence that any alleged damages are related to the environmental conditions in the commercial storage unit in the three years were casually connected to the Defendant, but rather, if any, arise from Mr. Marrone's abandonment of the property and a lack of competent evidence of the existence of such damage..

98. From absence of an expert report by Metro Public Adjusters and the failure to offer the public adjuster Mr. Underkoffler's as a witness in support of Plaintiffs' damage claims, the Court will adopt a negative inference that that testimony of the PA would not support Plaintiffs damage claims in this action.

99. Plaintiffs have by their conduct and continued enjoyment of the full right, benefits and control of the storage unit have created an involuntary bailment in favor of non-party US Storage for storage fees beyond those already paid by Defendant Meiloch.

20

100. The Court finds Mr. Marrone's testimony, in viewing it in totality , apparent self-interest, content and demeanor at trial, rendered him wholly non credible as a witness and the disproportionate amount of the conduct of litigation of dubious claims in this matter of record and the continuing evidence of truculent litigation posturing, unnecessarily contentiousness communication of counsel in e.g. in email exchanges and correspondence submitted of record, patent abuse of process and the perversion of this action into petty revenge seeking vehicle and was is a misuse of the Court.

## Conclusions of Law

1. Plaintiffs did not have possession of the property at issue in this lawsuit prior to July 29, 2017 because Mr. Marrone had been evicted from the Condo by virtue of a Temporary Protection from Abuse Order.

2. The legitimacy and/or ultimate disposition of the TPFA Order over three years after its entry of the Court has no bearing on this Court's determination of the claims at issue in this case as the only significance to the proceeding is that an Order was admittedly in place and had the legal effect of excluding Mr. Marrone from the Condo; this matter is governed by the claims asserted in Plaintiffs' Second Amended Complaint, the defenses asserted in Defendant's New Matter and the admissible evidence in this action.

21

3. Defendant had the exclusive right to live in the Condo during the time periods at issue in this case by virtue of the TPFA Order, an Order the provided her with incidental possession of Plaintiffs' property.

4. Defendant did not "take possession" of Plaintiffs' property, repeatedly encouraged Plaintiffs to remove their property to an accessible location and exercised *de minimus* dominion over it only briefly in order to transfer it to a safe location where Plaintiffs could secure unrestricted control over and take possession of their property.

5. Defendant, although motivated by credible self-protection fears, did not provide Plaintiffs with notice before moving the personal property, did not obtain their permission to move it and did not have a legal justification to move it.

6. Nevertheless, the Court concludes that Defendant's actions were never intended to interfere with Plaintiffs' right to possess or control their property and made the property even more available to them than when it was within the Condo.

7. Plaintiffs' objections to the transfer of the property are based upon their asserted "right" to store or virtually abandon it in the Condo for free (and presumably demand repeated access at their whim), a legal right for which they have offered no authority and the alleged interference with which was neither addressed nor proven during the trial.

8. Plaintiffs submitted to the Court the issues related to equitable relief and adjudicated this purported "right" when they filed their Emergency Petition for

22

Injunctive Relief seeking an order requiring Defendant to move the property back to the Condo.

9.  Plaintiffs were denied relief and a ruling in their favor that such a right existed when they sought an emergency injunction and their action was dismissed by Order of the Court.

10. Plaintiffs' failure to prevail on their application for Injunctive Relief and their failure to appeal the issuance of a final order after the dismissal of their Petition operates to preclude their claims of a right to have the property moved back to the Condo.

11. Defendant's action did not "deprive" Plaintiffs of their property or cause them to be dispossessed.

12. Defendant immediately sought to divest herself of Plaintiffs' property and to make it immediately and unreservedly available to them; essentially, her actions represent the antithesis of withholding the property from Plaintiffs, and, as a matter of law, do not amount to dispossession, deprivation, interference or detention of Plaintiffs' property.

13. While a replevin action is essentially to establish the right of immediate possession which right is based upon a title or property interest, either general or special, in the chattel withheld from claimant, *Valley Gypsum Co. v. Pennsylvania State Police*, 581 A.2d 707, 710 (Pa. Cmwlth. 1990), the evidence here does not establish that the property in question was "withheld" from Plaintiffs by Defendant: to the contrary, Defendant acknowledging Marrone's possessory rights put the storage unit in Mr. Marrone's name and tried multiple times to provide him with the key and she

23

initially charitably prepaid the charges so that there would be no impediment to his immediately removing his property.

14. Plaintiffs' replevin claim is based upon the assertion that Defendant had "detained" their property in a storage unit to which Defendants were denied access; however, the facts do not establish detention and the only impediment to access was Plaintiffs' own obdurate conduct and unreasonable refusal to accept the key or to acknowledge any possessory right to the property and potentially assume liability for the storage costs.

15. Defendant never claimed or asserted a superior right, or even any right to the property and, by putting the storage unit in Mr. Marrone's name, Defendant conceded Mr. Marrone's indisputable possessory interest.

16. The primary relief in a replevin action is the return of the property and since Defendant never possessed the property, the Court has no legal foundation to enter an order directing her to return it and Defendant does not cite a single case on replevin that would support such a directive.

17. The requirement of mitigation of damages has been applied in replevin actions. *American Law of Torts §24:21.*

18. Equitable principles are applicable to a legal action in replevin. *See Brandywine Lanes, Inc. v. Pittsburgh National Bank,* 220 Pa.Super. 363, 284 A.2d 802 (1971). *See Sprague v. Casey,* 520 Pa. 38, 46, 550 A.2d 184, 188 (1988) ("He who seeks equity must do equity.").