J-A29016-25

2026 PA Super 78

| | | |
|---|---|---|
| SCOTT MARTIN | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| THOMAS CHEVROLET | : | No. 302 WDA 2025 |

Appeal from the Judgment Entered April 24, 2025
In the Court of Common Pleas of Bedford County Civil Division at No(s):
No. 892 of 2012

BEFORE:  OLSON, J., DUBOW, J., and BENDER, P.J.E.

OPINION BY OLSON, J.:                    **FILED:  April 21, 2026**

Appellant, Scott Martin, appeals from the April 24, 2025 judgment entered in the Court of Common Pleas of Bedford County after a jury found in favor of Thomas Chevrolet on Appellant's wrongful termination claim.  We affirm.

The record reveals that, on November 29, 2021, Appellant filed a complaint against Thomas Chevrolet setting forth one count for wrongful termination.  In the complaint, Appellant alleged that his employment with Thomas Chevrolet was terminated "in retaliation for his refusal to participate in insurance fraud at [his supervisor's] instruction."[1]  Complaint, 11/29/21, at

---

[1] At the time of his termination, Appellant was employed by Thomas Chevrolet as a senior auto body technician.  Complaint, 11/29/21, at ¶3.  Appellant's supervisor, prior to his termination, was William Maust ("Mr. Maust"), who was the manager of the auto body shop at Thomas Chevrolet.  *Id.* at ¶4.

J-A29016-25

¶23.  On September 19, 2024, a jury returned a verdict in favor of Thomas Chevrolet, finding that Appellant was not wrongfully terminated from his employment.  Appellant filed a motion for post-trial relief on September 27, 2024, which the trial court denied on February 12, 2025.  On March 10, 2025, Appellant filed a notice of appeal challenging the trial court order that denied his post-trial motion.  On April 24, 2025, judgment was entered in favor of Thomas Chevrolet and against Appellant in the amount of $0.00.[2]

Appellant raises the following issues for our review:

[1.]  Did the trial court err in failing to charge the jury on the Cat's Paw theory?

[2.]  Did the trial court err in failing to strike Juror [# 4,] who failed to respond truthfully during *voir dire*?

[3.]  Did the trial court err in failing to strike [Juror # 4] due to her close relationship with Christopher Carpenter [("Mr. Carpenter")], one of [Thomas Chevrolet's] owners?

_____

[2] We treat Appellant's notice of appeal as having been filed on April 24, 2025, upon entry of judgment.  ***See Am. and Foreign Ins. Co. v. Jerry's Sport Ctr., Inc.***, 948 A.2d 834, 842 n.1 (Pa. Super. 2008), *aff'd*, 2 A.3d 526 (Pa. 2010); ***see also*** Pa.R.A.P. 905(a)(5) (stating, "[a] notice of appeal filed after the announcement of a determination but before the entry of an appealable order shall be treated as filed after such entry and on the day thereof"); ***Johnston the Florist, Inc. v. TEDCO Constr. Corp***, 657 A.2d 511, 514 (Pa. Super. 1995) (*en banc*) (stating, entry of judgment is a prerequisite to the exercise of this Court's jurisdiction); ***Funk v. Empfield***, 281 A.3d 315, 319 (Pa. Super. 2022) (stating, "[i]n civil matters, an appeal to this Court can only lie from judgments entered subsequent to the trial court's disposition of post-trial motions, not from the order denying post-trial motions" (citation, original quotation marks, and original brackets omitted)).

- 2 -

J-A29016-25

> [4.] Did the trial court err by excluding the extensive evidence that [Mr. Maust] directed [Thomas Chevrolet's] other [auto] body shop technicians to commit fraudulent acts?
>
> [5.] Did the trial court err by excluding the January 5, 2022 [electronic mail ("email")] from Trisha Gill, [Esquire ("Attorney Gill")] to Brooke Jones [("Ms. Jones")] and Kenneth Salem [("Mr. Salem")]?

Appellant's Brief at 4-5.

Appellant's first issue challenges the trial court's denial of a jury instruction on the Cat's Paw theory of recovery.[3] *Id.* at 18-29.

> Our standard of review regarding jury instructions is limited to determining whether the trial court committed a clear abuse of discretion or error of law which controlled the outcome of the case. Error in a charge occurs when the charge as a whole is inadequate or not clear or has a tendency to mislead or confuse rather than

_____

[3] "Under the Cat's Paw theory, if a supervisor performs an act motivated by discriminatory *animus* that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate [adverse] employment action, then the employer is liable[.]" ***Barbosa v. Chatham Acres Healthcare Grp., Inc.***, 2019 WL 6329386, at *4 (Pa. Super. filed Nov. 26, 2019) (unpublished memorandum) (original quotation marks and original brackets omitted), *citing* ***Staub v. Proctor Hosp.***, 562 U.S. 411, 422 (2011).

> The term "cat's paw" derives from a fable conceived by Aesop, put into verse by *La Fontaine* in 1679, and injected into United States employment discrimination law by Judge [Richard] Posner in 1990. In the fable, a monkey induces a cat by flattery to extract roasting chestnuts from the fire. After the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing. A coda to the fable (relevant only marginally, if at all, to employment law) observes that the cat is similar to princes who, flattered by the king, perform services on the king's behalf and receive no reward.

***Staub***, 562 U.S. at 415 n.1 (citation omitted).

clarify a material issue. Conversely, a jury instruction will be upheld if it accurately reflects the law and is sufficient to guide the jury in its deliberations.

The proper test is not whether certain portions or isolated excerpts taken out of context appear erroneous. We look to the charge in its entirety, against the background of the evidence in the particular case, to determine whether or not error was committed and whether that error was prejudicial to the complaining party.

In other words, there is no right to have any particular form of instruction given; it is enough that the charge clearly and accurately explains the relevant law.

*James v. Albert Einstein Med. Ctr.*, 170 A.3d 1156, 1163-1164 (Pa. Super. 2017) (citation omitted); *see also Hagans v. Hosp. of the Univ. of Pennsylvania*, 343 A.3d 251, 271 (Pa. Super. 2025).

Appellant asserts that the trial court permitted him to proceed under the Cat's Paw theory during the litigation of his cause of action by denying Thomas Chevrolet's motion for summary judgment and a motion for compulsory nonsuit. Appellant's Brief at 19-20. The trial court, however, denied Appellant's request for a jury instruction on the Cat's Paw theory marking a break from its prior rulings. *Id.* at 20. Appellant avers that "[n]o standard jury instruction exists in Pennsylvania for the Cat's Paw theory." *Id.* at 22. Appellant contends that the trial court's strict adherence to use of only standard jury instructions was "not the appropriate method for properly instructing a jury and avoiding prejudice." *Id.* at 21. Appellant argues that "[i]f the trial court is correct that the Cat's Paw theory cannot be explained to a jury without bias or confusion then the theory, as a matter of law, ceases to

exist in practice[, which] is contrary to [the precedent set forth in **Staub**, **supra**.]" **Id.** at 23. Appellant asserts that, although the trial court permitted him to argue the Cat's Paw theory during his closing argument, this was not the equivalent of providing a jury instruction on the theory. **Id.** Appellant contends that the trial court's jury instruction on factual cause, which, according to Appellant, included the instruction that "[c]onduct is a factual cause of harm when the harm would not have occurred, absent the defendant's conduct["] places emphasis on the conduct of Thomas Chevrolet as an entity "as opposed to the potential for a supervisor's malignant influence." **Id.** at 27. Appellant asserts that without the Cat's Paw theory jury instruction, the jury lacked "an essential tool to make an informed decision based on correct and complete legal principles relevant to its verdict." **Id.** at 27-28.

The trial court explained its reasoning for excluding the Cat's Paw theory from its jury instruction as follows:

> In sum, we found it most appropriate and helpful for the jury to [receive] the general instructions regarding causation, while also permitting [Appellant] to argue his [Cat's Paw] theory in closing. As we stated on the record, [Appellant's] theory of causation was dependent on the jury accepting a particular set of facts advantageous to [Appellant], and we did not want our instructions to unnecessarily interfere with the jury's role as the fact-finder.

Trial Court Opinion, 5/29/25, at 2.

In his amended proposed points of charge, Appellant asked the trial court to provide, *inter alia*, the following jury instruction:

### 10. Agency - General Instruction

In this case, [Appellant] seeks damages from Thomas Chevrolet for harm caused by [Mr.] Maust's wrongful conduct. [Appellant] claims that [Mr.] Maust acted as Thomas Chevrolet's agent. An agent is someone who agrees to act for someone else, in this case - the business, under the business's control. A business may be legally responsible for harm caused by its agent's wrongful conduct. For example, a business is held responsible when a supervisor is motivated by a wrongful reason, and that supervisor influences the termination.

Appellant's Amended Proposed Points of Charge, 9/16/24, at 13 (formatting modified), *citing* **Barbosa**, **supra**, and **Staub**, **supra**. The trial court denied Appellant's request for this instruction, stating,

I mean, I'm not going to instruct them on that. I'll give the general instruction on factual causation and I think that's the proper thing to do. If I think they can get any further on that, then I'm highlighting the evidence in favor of one party over the other and I don't like doing that. You can argue that, but I'm going to give the – and I think the general instruction includes, it has to be a factual cause of the damages or of the termination. But I think it is correct that if they have – if there's another legitimate reason for termination, then there's – then there isn't causation. So that's a thing for the jury, I think, to take up in their factfinding.

N.T., 9/17/24, at 13-14. During its charge, the trial court provided the following, pertinent instructions:

All right. So that concludes how you are to assess the evidence in the case. I'll now give you the definition of the burden of proof here and then I'll give you further instructions on what the claim is and any defenses in the case. Now, under the law, the plaintiff has the burden of proving his claim by a preponderance of the evidence. Also, the defendant, if you get to this point in the verdict slip, has a burden of proving the defense of mitigation of damages by a preponderance of the evidence.

Now, as I said before, this is a civil case, not a criminal case. The burden of proof in a civil case is different from the burden of proof in a criminal one. In a civil case, the plaintiff must prove their claims by a legal standard called a preponderance of the evidence. Preponderance of the evidence means that a fact is more likely true than not.

Think about the scales of justice or an old fashioned balanced scale with a pan on each side to hold the objects. Imagine using this scale as you deliberate in the jury room. Place all the believable evidence favorable to the plaintiff in one pan, place all the believable evidence favorable to the defendant in the other. If the scales tip even slightly to the plaintiff or the person that has the burden of proof on that particular issue, then the plaintiff or that party has met their burden of proving that fact. If, however, the scales tip even slightly to the other person's side or if the two sides of the scale balance equally, then that burden of proof has not been met.

**Now, in this case, the plaintiff seeks damages from the defendant for harm caused by the defendant's agent or employee from that employee's wrongful conduct. Now, the plaintiff claims that the employee or agent acted as the defendant's agent or employee. An agent is someone who agrees to act for someone else called the principal, in this case the employer, under the principal's control. A principal may be legally responsible for harm caused by the agent's wrongful conduct.**

Now, under Pennsylvania law, an employer may terminate an employee for any reason or no reason, unless the plaintiff proves in this case that the termination violated the law. In this case, the plaintiff claims that his employer wrongfully terminated his employment for refusing to commit the crime of insurance fraud.

It is a violation of the law for an employer to terminate an employee for refusing to commit an illegal act at the request of the employer. If you find the plaintiff's refusal to commit an illegal act at the request of their employer was a factual cause for the termination, then the plaintiff has established a violation of the law.

Now, let me talk a little bit about causation. So here the plaintiff has to prove the wrongful termination [as] I just defined that to you and that that was a causation of the termination or that

caused the termination. I'll now define to you what causation means. In order for the plaintiff to recover in this case, the defendant's conduct must have been a factual cause in bringing about the harm.

Conduct is a factual cause of harm when the harm would not have occurred, absent the defendant's conduct. To be a factual cause, the conduct must have been an actual real factor in causing the harm, even if the result is unusual or unexpected. A factual cause cannot be an imaginary or fanciful factor having no connection or only an insignificant connection with the harm.

Now, in this case, the plaintiff claims that the illegal action that was requested by the employer was that he commit insurance fraud. I'll define [for] you that statute as it's defined in the crimes code in Pennsylvania. So this is, there's two versions of insurance fraud that are relied upon here. So first, that the defendant assisted, solicited or conspired with another to prepare any statement intended to be presented to any insurer or self insurer.

Second, that the statement was intended to be presented to any insurer or self insured in connection with or in support of any insurance claim. Third, that the statement contained false, incomplete or misleading information concerning any fact or thing material to the claim, including but not limited to information that documents or supports an amount claimed in excess of the actual loss sustained by the claimant. Material information means, information the agency would regularly rely upon in making [its] official determinations or findings. And fourth, that the defendant did so and made the statement that was intended to defraud any insured or self insured.

Now, this second version of insurance fraud here would be first, that the defendant must derive some benefit, either directly or indirectly from the proceeds of an act of insurance fraud. And second, that the benefits were obtained through the assistance, conspiracy or urging of any person involved in the fraudulent insurance claim. And third, that the defendant did so knowingly. So that is a definition [of] what the plaintiff must prove in the case.

*Id.* at 165-169 (emphasis added). At the conclusion of the charge, the trial court asked counsel for both parties if they had any objection to the

- 8 -

instructions. Counsel for Thomas Chevrolet did not lodge an objection to the instructions, and counsel for Appellant stated, "No. I think my prior objections are already on the record." *Id.* at 179.

Upon review, we discern no error of law or abuse of discretion in the trial court's order that denied Appellant's request to provide a jury instruction on agency or the Cat's Paw theory of recovery, as described *supra*. The Cat's Paw theory is based upon agency principles whereby an employer-principal may be liable for the *animus* actions of its employee-agent when those actions are unlawful and the causal factor in an adverse employment decision affecting the terminated employee. Here, the trial court, as emphasized *supra*, explained the theory of agency liability to the jury in a clear, neutral, and succinct way so as to explain the relevant law without invading the province of the jury as fact-finder. Thus, Appellant's first issue merits no relief.

In his second and third issues, Appellant challenges the trial court's denial of his request to discharge seated Juror # 4 on the grounds that Juror # 4 had, what Appellant described as, a close familial relationship to Mr. Carpenter, who was a partial owner of Thomas Chevrolet and a witness during the trial. Appellant's Brief at 30-37.

"[T]he right to a trial by an impartial jury is enshrined in the Pennsylvania Constitution, *see* PA. CONST. art. I, § 6, which guarantees that 'trial by jury shall be as heretofore, and the right thereof remain inviolate.'" *Bruckshaw v. Frankford Hosp. of City of Philadelphia*, 58 A.3d 102, 108

(Pa. 2012); *see also Shinal v. Toms*, 162 A.3d 429, 438 (Pa. 2017) (reiterating that, "[o]ne of the most essential elements of a successful jury trial is an impartial jury" (citation and original quotation marks omitted)). "[T]he fairness and impartiality of a jury are as scrupulously protected in a civil case as in a criminal case." *Bruckshaw*, 58 A.3d at 109. "Importantly, it is not simply the fact of partiality, but also the appearance of partiality or bias that the trial court must consider" and guard against. *Shinal*, 162 A.3d at 438. "Challenges for cause are essential means by which to obtain a jury that in all respects is impartial, unbiased, free from prejudice, and capable of judging a case based solely upon the facts presented and the governing law." *Id.*

Appellant asserts that Juror # 4's "relationship with Mr. Carpenter create[d] a perception of bias or prejudice, which the trial court failed to address by refusing to strike [Juror # 4] for cause." Appellant's Brief at 32. Appellant avers that Juror # 4 is Mr. Carpenter's second cousin through marriage. *Id.* at 33. Appellant argues that, when questioned about their relationship by the trial court, Juror # 4 referred to Mr. Carpenter by his first name, which "indicate[d] a close connection in support of a strike for cause." *Id.* Appellant contends that Juror # 4 had "regular contact" with Mr. Carpenter at a convenience store where Juror # 4 worked and Juror # 4 "provided inconsistent testimony on whether, or not, she wait[ed] on [Mr. Carpenter] when he visit[ed] her workplace and when she last saw him[.]" *Id.* at 34. Appellant argues that the "familiarity of the parties, regular contact,

and inconsistent answers are further evidence of the potential for prejudice." ***Id.***

Generally, the test for determining whether, or not, a juror should be disqualified is "whether he or she is willing and able to eliminate the influence of any scruples and render a verdict according to the evidence, and this is to be determined on the basis of answers to questions and demeanor." ***Shinal***, 162 A.3d at 440 (citation omitted). In other words, whether the juror will be impartial and unbiased at trial. Typically, "the decision on whether to disqualify [a juror] is within the discretion of the trial court and will not be reversed in the absence of a palpable abuse of discretion." ***Id.*** (citation and original brackets omitted). Appellate courts, however, "have required the trial court to grant a challenge for cause in two scenarios: when the [] juror has such a close relationship, familial, financial, or situational, with the parties, counsel, victims, or witnesses or, alternatively, when the juror demonstrates a likelihood of prejudice by his or her conduct and answers to questions." ***Id.*** (original quotation marks and citations omitted); ***see also Cordes v. Assocs. of Internal Med.***, 87 A.3d 829, 834 (Pa. Super. 2014) (*en banc*) (plurality opinion), *appeal denied*, 102 A.3d 986 (Pa. 2014). When it is established that a juror has a "close relationship" with a party, counsel, a victim, or a witness, prejudice or bias is implied *per se* and evidence of actual prejudice or bias need not be proven. ***Shinal***, 162 A.3d at 440-441 (stating, "[i]mplied bias [or prejudice] is presumed as a matter of law based upon special

- 11 -

circumstances and is attributable in law to the [] juror regardless of actual partiality" (citation and original quotation marks omitted)).

When a determination regarding a challenge to a juror is based upon allegations of a close relationship, whether it be familial, financial, or situational closeness, or a combination thereof, we review a trial court's determination *de novo* and our scope of review is plenary. **Id.** at 441. When the relationship is not sufficiently close to constitute *per se* prejudice, then a determination of whether, or not, the juror's indirect relationship with a party, counsel, a victim, or a witness will inhibit the juror's ability to be impartial turns on the answers and explanations provided by the juror regarding the relationship and an assessment of the juror's expressed ability to remain impartial, as brought forth in the examination of the juror by the trial court. **Id.** at 440-442; **see also Commonwealth v. Koehler**, 737 A.2d 225, 238 (Pa. 1999) (stating, "[t]he test for determining whether a [] juror should be disqualified is whether he [or she] is willing and able to eliminate the influence of any scruples and render a verdict according to the evidence, and this is to be determined on the basis of answers to questions and demeanor"), *cert. denied*, 531 U.S. 829 (2000). In this instance, the trial court "retains discretion to explore and assess the relevant relationship presented" and to determine the juror's ability, in light of that relationship, to remain impartial, and we review the trial court's determinations for an abuse of discretion. **Shinal**, 162 A.3d at 442; **see also Bruckshaw**, 58 A.3d at 110 (stating, "[t]he decision to remove a juror because of inability to perform the usual

functions and to seat an alternate juror is within the sound discretion of the trial court"). "It is imperative that any doubt the [trial] court may have regarding the impartiality of a juror must be resolved in favor of the party seeking to [discharge] the juror." *Lockley v. CSX Transp., Inc.*, 5 A.3d 383, 393 (Pa. Super. 2010), *appeal denied*, 34 A.3d 831 (Pa. 2011).

"The mere existence of **some** familial, financial, or situational relationship does not require dismissal [of a juror] in every case." *Shinal*, 162 A.3d at 443 (emphasis added). Case law, however, has been less than a model of clarity as to what level of familial relationship constitutes a "close relationship" for purpose of finding *per se* prejudice or bias. By way of example, in *Cordes*, then-Judge, now-Justice Wecht authored an opinion in support of reversal, which held that *per se* prejudice existed when it was disclosed that one juror's parents and another juror's wife were patients of the defendant-physician. *Cordes*, 87 A.3d at 842 (Wecht, J.) (stating that, "the clinical relationships of [the two jurors'] close family members with [the defendant-physician] were sufficiently close and real to warrant a finding of *per se* prejudice"). This author disagreed, finding that a **direct** relationship between the juror and a party, counsel, a victim, or a witness must exist for a finding of *per se* prejudice and that the relationships at issue in *Cordes* were indirect, such that and the potential disqualification of the jurors hinged on the answers and explanations they provided to the trial court regarding their ability to remain impartial. *Cordes*, 87 A.3d at 847-863 (Olson, J. dissenting). Furthermore, then-Judge, now-Justice Donahue authored an opinion in

- 13 -

support of reversal in which she, *inter alia*, agreed that the juror's wife's treatment by the defendant-physician was a close familial relationship warranting a finding of *per se* prejudice but that the juror's parents' treatment by the defendant-physician was not a close familial relationship warranting a finding of *per se* prejudice. **Cordes**, 87 A.3d at 867-869 (Donahue, J.).

In the case *sub judice*, counsel for Thomas Chevrolet raised a concern regarding Juror # 4 prior to the start of the third day of trial. N.T., 9/16/24, at 3. Mr. Carpenter stated that his wife and Juror # 4's mother were first cousins, thus making Mr. Carpenter's wife and Juror # 4 second cousins. **Id.** at 3. Mr. Carpenter further stated that he did not know the current surname of Juror # 4, only her maiden name, and that he, his wife, and Juror # 4 did not "get together for family [events] or anything like that." **Id.** Mr. Carpenter knew Juror # 4 worked at a local convenience store and that she would wait on him when he stopped at the convenience store to make a purchase. **Id.** at 4. Based upon the representations made by Mr. Carpenter, the trial court questioned Juror # 4 as follows:

> [Trial Court:]    Okay. [Juror # 4], you can sit in the seat in the first row. That's fine. So, [Juror # 4], you are not in trouble in anyway. I just have a couple questions for you. It was brought up that you may be somehow related to the witness that testified Friday, Mr. Carpenter.
>
> [Juror # 4:]    Distantly, my second cousin is married to him.
>
> [Trial Court:]    Okay. So you believe it to be second cousin. What do you think the relationship is, familial relationship through?

[Juror # 4:]     I just know him because he's married to my second cousin. My mother's cousins with her. That makes me her second cousin.

[Trial Court:]     Okay. How often do you see him, if you do?

[Juror # 4:]     I don't.

[Trial Court:]     Do you remember the last time you saw him?

[Juror # 4:]     I work at [a convenience store] and every now and then he'll stop in there, but I don't know when the last time he was in there.

[Trial Court:]     So you just have occasion -

[Juror # 4:]     I don't wait on him. I am back in the kitchen and say, there's Chris.

[Trial Court:]     Obviously, you remember when we talked at jury selection, the key thing is, you would sit on the jury as a fact[-]finder in the case. The important thing is that you can assess people's credibility and apply those standards evenly across all the witnesses. Given that you have a technical familial relationship with him, could you fairly hear his testimony the same as you'll hear all evidence?

[Juror # 4:]     Yes. That's why I - I don't have no - you know, no opinion one way or the other.

[Trial Court:]     Okay. So when I asked you if you have any relationship by blood, marriage or have a close association, I don't have notes that you answered that. But that, whether or not you have any relationship to him, that doesn't [affect] your ability to fairly hear his testimony in anyway?

[Juror # 4:]     No.

[Trial Court:]     Okay. And you - given your contact with him, you don't know anything about the case whatsoever?

[Juror # 4:]     No.

| | |
|---|---|
| [Trial Court:] | Before you came into the Courtroom? |
| [Juror # 4:] | No. |
| [Trial Court:] | Okay. All right. Ma'am, I'm going to have you back in with the jurors. |

*Id.* at 6-8. The trial court described Juror # 4's relationship with Mr. Carpenter as "very detached," having previously noted that there is "a high degree of [familial] relationships in [Bedford County]." *Id.* at 4, 10. The trial court credited the responses provided by Juror # 4, stating that her "relationship" with Mr. Carpenter would not affect her decision making or cause her to be partial. *Id.* at 10-11. Having found Juror # 4 to be credible, the trial court, thereupon, denied Appellant's request to discharge Juror # 4. *Id.* at 11.

The familial connection between Mr. Carpenter and Juror # 4 is technically first cousin once removed by virtue of marriage because, as described by Juror # 4 and Mr. Carpenter, the juror's mother and Mr. Carpenter's wife are first cousins.[4] As such, we find as a matter of law that the connection between Juror # 4 and Mr. Carpenter is indirect and does not constitute a close, familial relationship requiring the application of the *per se* prejudice rule. *See Shinal*, *supra*; *see also Cordes*, *supra*. Therefore, we

---

[4] In order for Juror # 4 and Mr. Carpenter's wife to be second cousins, Juror # 4's mother and Mr. Carpenter's wife's mother would have to be first cousins. *See* https://dictionary.cambridge.org/us/dictionary/english/second-cousin (last visited Mar. 25, 2026) (defining second cousin as "any person who is a child of a cousin of your mother or father").

- 16 -

turn to a review of whether, or not, the trial court abused its discretion in denying Appellant's request to discharge Juror # 4 based upon the inquiry it undertook.  Upon review, we concur with the trial court, and the record supports, that Juror # 4's connection to Mr. Carpenter is "very detached." Both Juror # 4 and Mr. Carpenter described their interaction as occasional and occurring only when Mr. Carpenter happened to frequent a convenience store where Juror # 4 worked.  The two individuals did not attend family functions together.  Moreover, the trial court found Juror # 4 credible in her response that she could remain impartial.  **See Koehler**, 737 A.2d at 238 (stating that, the trial court is in the best position to assess the credibility of a juror). Therefore, we find no abuse of discretion in the trial court's denial of Appellant's request to discharge Juror # 4.[5]

_____

[5] To the extent that Appellant asserts that Juror # 4's failure to identify her connection to Mr. Carpenter during the *voir dire* process warrants the grant of a new trial, we find this assertion to be of no avail under the circumstances of the case *sub judice.*  To obtain a new trial, Appellant was required to first demonstrate that Juror # 4 failed to answer a material question honestly during *voir dire* and second that a correct response would have provided a valid basis for a challenge for cause.  **See McDonough Power Equip., Inc. v. Greenwood**, 464 U.S. 548, 556 (1984) (stating, "to obtain a new trial in such a situation, a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause.  The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial."). Here, the trial court stated that, based upon the detached connection between Juror # 4 and Mr. Carpenter and Juror # 4's ability to remain impartial, the trial court would not have struck Juror # 4 for cause during the jury selection process.  N.T., 9/16/24, at 11.  Therefore, Appellant is not entitled to a new

In his fourth and fifth issues, Appellant challenges the trial court's decision to exclude certain evidence. First, Appellant alleges that the trial court erred in excluding evidence of post-termination allegations against Mr. Maust lodged by other auto body technicians, including an email correspondence between defense counsel, Attorney Gill, and Thomas Chevrolet employees, Ms. Jones and Mr. Salem. More specifically, these

_____

trial based upon Juror # 4's failure to identify her connection to a potential witness during the jury selection process.

Moreover, we find Appellant's reliance on **Commonwealth v. Rosario**, 182 A.2d 75 (Pa. Super. 1962) for the proposition that Juror # 4's failure to disclose her connection to Mr. Carpenter warrants the grant of a new trial to be misplaced. Appellant asserts that Juror # 4's failure to disclose her connection to Mr. Carpenter "deprived Appellant of the fully informed use of his peremptory challenges." Appellant's Brief at 31, *citing* **Rosario**, 182 A.2d at 76. In **Rosario**, this Court held that a juror's specific action of providing a negative answer to a question posed during *voir dire*, which amounted to an incorrect answer, misled counsel and "prevented an intelligent exercise of the defendant's right of peremptory challenge." **Id.** Here, Juror # 4 did not answer whether, or not, she was "related by blood, marriage or [had] a close association to" any of the individuals identified as potential witnesses at trial. **See generally**, N.T., 9/16/24, at 5-16. While Juror # 4's silence, arguably, could be viewed as a "negative answer," the record demonstrates that Appellant did not exercise a peremptory challenge to strike a different juror who confirmed that she also knew a potential witness, Mark Thomas, the representative for Thomas Chevrolet who was seated at counsel table during the *voir dire* process. The fact that Appellant did not exercise a peremptory challenge to strike a similarly situated juror who also knew a potential witness strongly suggests that Appellant evaluated the pool of potential jurors and chose to exercise peremptory challenges on other jurors that it deemed less qualified than a juror having a connection to a potential witness. As such, Appellant failed to show that he would have exercised a peremptory challenge had he known about Juror # 4's connection to Mr. Carpenter. It is well-established that a litigant is entitled to a fair trial not a perfect trial. **See Commonwealth v. Thornton**, 431 A.2d 248, 252 (Pa. 1981), *citing* **Lutwak v. United States**, 344 U.S. 604, 619 (1953).

allegations suggested that other auto body technicians reported fraud claims against Mr. Maust, and the email correspondence characterized these allegations as "problematic" for the defense. Appellant's Brief at 37-45. Second, Appellant asserts that the trial court erred in excluding the proffered testimony of another auto body technician employed by Thomas Chevrolet who alleged that Mr. Maust directed him to commit insurance fraud. *Id.*

> The admission or exclusion of evidence is within the sound discretion of the trial court, and in reviewing a challenge to the admissibility of evidence, we will only reverse a ruling by the trial court upon a showing that it abused its discretion or committed an error of law. To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party.

*Rissi v. Cappella*, 918 A.2d 131, 138 (Pa. Super. 2007) (citations and quotation marks omitted).

The trial court excluded the evidence described *supra* because it was irrelevant and because its prejudicial effects outweighed its probative value. The Pennsylvania Rules of Evidence define "relevant evidence" as evidence that "has any tendency to make a fact more or less probable than it would be without the evidence[ and] the fact is of consequence in determining the action." Pa.R.Evid. 401. "All relevant evidence is admissible, except as otherwise provided by law. Evidence that is not relevant is not admissible." Pa.R.Evid. 402. A trial court "may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair

prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.Evid. 403. In sum,

> [f]or evidence to be admissible, it must be competent and relevant. Evidence is competent if it is material to the issue to be determined at trial. Evidence is relevant if it tends to prove or disprove a material fact. Relevant evidence is admissible if its probative value outweighs its prejudicial impact.

*Est. of Hicks v. Dana Cos., LLC*, 984 A.2d 943, 961 (Pa. Super. 2009) (citation omitted), *appeal denied*, 19 A.3d 1051 (Pa. 2011). Evidence that a person committed another crime, wrong, or act may be admissible to show, *inter alia*, a common plan or scheme, if "the probative value of the evidence outweighs its potential for unfair prejudice." Pa.R.Evid. 404(b)(2). "Though a witness's credibility is always important in a trial, a witness may not be impeached on collateral matters." *Valentine v. Acme Markets, Inc.*, 687 A.2d 1157, 1160 (Pa. Super. 1997).

Appellant asserts that evidence showing Mr. Maust asked another auto body technician to commit fraud "undermine[d] the multiple claims made at trial that Appellant's bad attitude and performance, and not his refusal to commit fraud, led to his termination [and, thus Mr. Maust's alleged requests of the other auto body technician pertained] directly to causation." Appellant's Brief at 39 (footnote omitted). Appellant argues that the evidence was relevant to

> impeach the credibility of Mr. Maust, who claims that he never directed Appellant to commit insurance fraud[,] rebut [Thomas Chevrolet's] attempts to bolter Mr. Maust's credibility by pointing to his religious affiliation and trustworthiness[,] demonstrate that

- 20 -

Mr. Maust had a routine practice of engaging in insurance fraud[,] impeach [Thomas Chevrolet's] claims that its investigation into [Appellant's] allegations yielded no evidence of wrongdoing[, and] demonstrate that while Mr. Maust directed [] three [auto] body technicians to commit fraud, Appellant was the only one to refuse and lost his job as a result.

*Id.* at 38 (record citations omitted). Appellant argues that "if Mr. Maust has a routine practice of requesting his subordinates to commit insurance fraud, then that makes it more likely that Mr. Maust acted in conformity with that practice and requested Appellant to commit insurance fraud on the three vehicles." *Id.* at 40-41. Appellant also contends that "by presenting evidence of Mr. Maust's character, [Thomas Chevrolet] opened the door to character evidence." *Id.* at 41.

Appellant further asserts that the trial court erred in excluding questions concerning the email correspondence between Attorney Gill, Ms. Jones, and Mr. Salem. Appellant contends that the email was "relevant to undermining the credibility of [Ms. Jones]." *Id.* at 45. Appellant argues that he sought to introduce the emails "to rebut [Ms. Jones'] testimony by showing that [she] was put on notice by [defense] counsel that the other auto body technician's statements were problematic to [the defense]." *Id.* Appellant further contends that the emails undermine Thomas Chevrolet's claims that "its investigations turned up no evidence of fraudulent conduct by Mr. Maust." *Id.*

The issue raised, collectively, in Appellant's fourth and fifth issues, pertains to whether, or not, the trial court erred in excluding evidence that Mr. Maust requested other auto body technicians to commit insurance fraud.

- 21 -

Appellant's objections come in the form of two challenges to the trial court's rulings. First, as discussed in greater detail *infra*, Appellant challenges the exclusion of evidence of other auto body technician's interactions with Mr. Maust, which Appellant sought to introduce during his examinations of certain Thomas Chevrolet employees. The trial court reasoned that Thomas Chevrolet's post-termination discovery of allegations raised by other auto-body technicians was not probative of the causes of Appellant's termination. Appellant further challenges the trial court's decision to exclude certain testimonial evidence from one of the auto body technicians unless the testimony directly related to the same circumstances, namely the same request to commit fraud on the same vehicle, that Appellant relied on as the basis of his wrongful termination case. Here, the trial court held that the evidence was irrelevant because it did not relate to the same instance of fraud and its prejudicial effect outweighed its probative value.

We begin by examining the trial court's ruling to exclude the evidence based on relevancy and the fact Thomas Chevrolet allegedly learned of the evidence of Mr. Maust's interaction with other auto body technicians post-termination and, therefore, the evidence could not form the basis of Appellant's termination. At trial, Appellant's counsel asked Stephanie Martz ("Ms. Martz"), the president of Thomas Automotive Family, which operates Thomas Chevrolet, "Now, **after [Appellant's] termination**, you're aware that [another auto body technician] made similar allegations against [Mr.] Maust as those made by [Appellant]?" N.T., 9/13/24, at 15 (emphasis added).

Defense counsel objected, arguing, *inter alia*, that "we don't believe that any information they gathered [] from other employees about their perception of [Mr.] Maust is admissible – is relevant to the decision to terminate [Appellant] because it occurred post[-]termination." ***Id.*** at 17. Appellant's counsel asserted that evidence of another auto body technician's statements regarding Mr. Maust's unlawful requests was relevant "to show that [Thomas Chevrolet was] put on notice that another [auto body technician] had issues similar to [Appellant, which] undermine[d] the credibility of [Thomas Chevrolet's] post[-]termination investigation." ***Id.*** at 18. In sustaining the objection, the trial court stated,

> I don't know that this trial should be solely about what we believe the character of [Mr.] Maust to be, because that is largely irrelevant, unless it fits into why [Appellant] was terminated.

***Id.*** at 23.[6]

---

[6] In issuing its ruling, the trial court further stated:

> [Appellant does not] necessarily need to prove that insurance fraud was in fact happening or did in fact happen. You [merely] need - you just need to prove that he was fired because he wouldn't commit insurance fraud. So really what - or commit a crime. So what - what I don't think we can get into is making the trial about, proving that a crime happened, because that - that gets less - that's less probative and that just - I think then we get into the rule of evidence of, the prejudicial effects substantially outweighing the probative value of that point. Because, then we are just trying to show that something illegal was going on at [Thomas Chevrolet] rather than how that actually ties into the termination of [Appellant's employment].

Later, during the cross-examination of Mr. Salem, Thomas Chevrolet's vice president of organizational development, Appellant's counsel asked Mr. Salem if the other auto body technician "made allegations about [Mr.] Maust" during a telephone conversation between Mr. Salem, Ms. Jones, and the other auto body technician. N.T., 9/16/24, at 135. In response to defense counsel's objection, Appellant asserted that defense counsel "opened the door" to his line of questioning because defense counsel asked Mr. Salem about his investigation regarding Appellant's allegations and that it was implied, through Mr. Salem's testimony, that Thomas Chevrolet did not find any allegations of wrongdoing. *Id.* at 135-136. Appellant contends that an email between Mr. Salem and Ms. Jones contains a summary of the other auto body technician's

---

. . .

What I don't want this trial to devolve in to is we are trying a case about whether or not insurance fraud happened on other vehicles, because that's largely irrelevant to [Appellant's] case. What you need to prove is that [Appellant] would not commit those acts as directed on those three vehicles and that because of that, he was terminated.

Getting into what happened on other vehicles, what other employees said happened, that's too far field and I think we are just getting into more impugning the character of the business, rather than actually getting to the heart of the matter. So, I think in that way, the prejudicial effect of that substantially outweighs the probative value.

N.T., 9/13/24, at 25-27. In explaining its ruling, the trial court seemly anticipated additional evidentiary issues arising, later in the trial, relating to potential testimony proffered by the other auto body technician regarding separate requests made by Mr. Maust to commit insurance fraud.

allegations against Mr. Maust in which the other auto body technician "stated that [Mr.] Maust asked him to do many questionable things that [he] refused to do." *Id.* at 137. The trial court responded,

> I don't think they opened the door to that. **The only allegations of fraud that are relevant to this case that the jury knows about are what's in the complaint [(referring to Appellant's allegations that Mr. Maust asked him to commit insurance fraud with regard to the repair of three specific vehicles)] and that's what we are here to litigate.**
>
> If we go – and I don't think I'm strapping your case at all, because for it to come in that – now it's just overly confusing for the jury if they start hearing about other people saying this when there's no context for it. I don't think its relevant, because this is post-termination and [the other auto body technician] wasn't even complaining about the same allegations [as Appellant.] It's just very confusing for the jury, I think, and [its] prejudicial effects [] outweighs the probative values. Substantially outweighs the probative value of it.
>
> And I don't think they opened the door. I think they were very careful in doing that. Grant you, they were general questions about the investigation but again, the jury only knows about these three allegations.

*Id.* at 140 (emphasis added). As the trial court previously explained,

> What [Appellant] need[s] to prove is that [he] would not commit those acts as directed on those three vehicles and that because of that, he was terminated. Getting into what happened on other vehicles, what other employees said happened, that's too far field and I think we are just getting into more impugning the character of the business, rather than actually getting to the heart of the matter. So, I think in that way, the prejudicial effect of that substantially outweighs the probative value.

N.T., 9/13/24, at 26-27 (formatting modified).

Initially, we note that "[u]nder Pennsylvania law, employment is presumed to be at-will unless it is shown that the parties contracted to restrict the right to terminate employment." *Deal v. Children's Hosp. of Philadelphia*, 223 A.3d 705, 711 (Pa. Super. 2019) (citation omitted). "An at-will employment relationship may be terminated by either the employer or the employee at any time, for any reason, or for no reason." *Id.* (citation omitted). "As a general rule, an at-will employee has no common law cause of action for wrongful discharge against her [or his] employer." *Id.* at 711-712. (citations omitted). "A limited exception to this rule exists and an action for wrongful discharge can be brought only where the termination of employment implicates a clear mandate of Pennsylvania public policy." *Id.* at 712 (citations omitted). "This public policy exception applies and permits a cause of action for wrongful discharge where the employer discharges an employee for[, *inter alia*,] refusing to commit a crime[.]" *Id.*

In his complaint, Appellant alleged that "[Thomas Chevrolet] terminated his employment in retaliation for his refusal to participate in insurance fraud at [Mr.] Maust's instruction." Complaint, 11/29/21, at ¶23. A person commits insurance fraud if, *inter alia*, he or she

> Knowingly and with the intent to defraud any insurer or self-insured, presents or causes to be presented to any insurer or self-insured any statement forming a part of, or in support of, a claim that contains any false, incomplete or misleading information concerning any fact or thing material to the claim.

> [or]

> Knowingly and with the intent to defraud any insurer or self-insured, assists, abets, solicits or conspires with another to prepare or make any statement that is intended to be presented to any insurer or self-insured in connection with, or in support of, a claim that contains any false, incomplete or misleading information concerning any fact or thing material to the claim, including information which documents or supports an amount claimed in excess of the actual loss sustained by the claimant.

18 Pa.C.S.A. §§ 4117(a)(2) and (a)(3). Thus, to prove a claim for wrongful termination, Appellant was required to demonstrate that Thomas Chevrolet, *vis-à-vis* Appellant's supervisor Mr. Maust, asked Appellant to commit insurance fraud, that he refused to commit insurance fraud, and in retaliation for his refusal, Thomas Chevrolet terminated his employment.

In both his questioning of Ms. Martz and Mr. Salem, Appellant sought to introduce evidence that Thomas Chevrolet allegedly learned of additional allegations against Mr. Maust **after** Appellant's termination in which Mr. Maust asked other employees to commit insurance fraud. Upon review, we discern no abuse of discretion or error of law in the trial court's ruling that evidence consisting of statements made by other employees regarding their interaction with Mr. Maust that Thomas Chevrolet learned about **after** the termination of Appellant's employment was not relevant to the issue of whether, or not, Appellant was terminated because he refused to commit a criminal act at the request of Mr. Maust. Even if the allegations were true, namely that Mr. Maust engaged in a common practice or scheme of asking the auto body technicians to commit insurance fraud, Thomas Chevrolet learned about these allegations **after** it terminated Appellant's employment. Thus, Appellant cannot rely upon

such evidence to establish the reason Thomas Chevrolet terminated his employment.

Regarding the exclusion of certain aspects of the other auto body technician's testimony, on the third day of trial, the trial court preemptively reiterated its evidentiary ruling regarding evidence of statements made to Thomas Chevrolet by other employees regarding Mr. Maust as follows:

> So my ruling was that, if a statement was made post-termination, but it dealt with – it related back to the instances on these three vehicles, that could be admissible.  So at the time – well, at the time the statement was made, it could be post-termination, but it's got to relate back to those three vehicles that we are talking about[.  If] there's a vehicle that was worked on post-termination, that doesn't come in, because that's coming in to prove whether or not insurance fraud was committed post-termination.  That's irrelevant in my mind.

N.T., 9/16/24, at 12.  A discussion then occurred as to whether, or not, the other auto body technician would be permitted to testify about his being asked to complete repair work on a Nissan Rogue vehicle that was originally assigned to Appellant prior to his termination.  *Id.* at 12-17.  The trial court held that the other auto body technician's complaint of fraud, namely his being asked by Mr. Maust to replace a Nissan Rogue vehicle part **with the wrong part**, was "wholly separate" from Appellant's claim of fraud, which was based on his being asked by Mr. Maust to replace a Nissan Rogue vehicle part **that was not damaged**.  *Id.* at 17.  The trial court explained that

> If the testimony from [the other auto body technician] was [Mr.] Maust comes to [the other auto body technician] and says, you are now doing the work that [Appellant] refused to do, replace this bumper bar and absorber.  And[, the other auto body

technician] says, I don't think they are damaged. I'm not going to replace them. That's the same claim [Appellant] had and I'd let that in **because that's the same vehicle and it's the same claim [Appellant] made.**

[The other auto body technician is] making a different claim, because there's no testimony here that [Appellant] examined the bumper bar and said it's the wrong part. That wasn't [Appellant's] argument. [Appellant's] argument and the reason you are linking that to the wrongful termination is that he's saying the original [vehicle part] wasn't broken, so it didn't need replaced. That's not what [the other auto body technician] is saying.

So, it's coming in to prove that [Mr.] Maust committed insurance fraud **on another occasion and post-termination**. So, I think for those two reasons, it doesn't come in.

*Id.* at 19 (emphasis added).

Upon review, we discern no abuse of discretion or error of law in the trial court's determination that the other auto body technician's proffered testimony that he was asked by Mr. Maust to replace a vehicle part with the wrong part was not relevant to proving Appellant's claim for wrongful termination and that the prejudicial effect of the proffered testimony substantially outweighed the probative value. Evidence that the other auto body technician was allegedly asked by Mr. Maust to replace a part on a Nissan Rogue vehicle with an incorrect part is not relevant to establishing the necessary elements to support Appellant's claim for wrongful termination, namely that he was asked to replace an undamaged part on a Nissan Rogue vehicle and, because he refused to do so, he was terminated. The trial court narrowly tailored its evidentiary ruling to permit evidence from the other auto body technician if his interaction directly mirrored Appellant's interaction with

Mr. Maust, namely that the other auto body technician was asked to commit the same act of fraud on the same vehicle that was asked of Appellant, because such evidence would be potentially probative to establish Appellant's claim of wrongful discharge. Evidence unrelated to Appellant's claim, as the trial court explained, was both irrelevant and prejudicial and, therefore, was inadmissible. We discern no error of law or abuse of discretion in the trial court's evidentiary ruling.

In sum, as discussed *supra*, we discern no abuse of discretion or error of law in the trial court's evidentiary ruling that Appellant was permitted to introduce evidence that Mr. Maust asked the other auto body technician to replace a vehicle part on a Nissan Rogue vehicle that was, in fact, not damaged, because that allegation, in part, supported Appellant's claim for wrongful termination. We discern no abuse of discretion or error of law in the trial court's ruling that Appellant was precluded from introducing evidence of what Thomas Chevrolet learned **after** Appellant was terminated because this knowledge could not have formed the basis for his termination or evidence that Mr. Maust asked other auto body technicians to commit insurance fraud on vehicles, other than the vehicles alleged in Appellant's complaint. As the trial court correctly determined, such evidence was irrelevant to establishing the elements of Appellant's cause of action and the prejudicial effect of such evidence outweighed its probative value.

Judgment affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


DATE:  4/21/2026